ESSEX COMPANY vs. PACIFIC MILLS.
SAME vs. PEMBERTON MILLS.
SAME vs. WASHINGTON MILLS.

A contract to deliver a certain number of ounces of silver, of a specific fineness, or an equivalent in gold, on a certain day, is a contract for the delivery of a commodity, of a specific quantity and quality, and not for the payment of money.

In case of the breach of a contract to deliver a commodity, the usual and ordinary measure of damages is the market value thereof at the time when it should have been delivered, with interest.

The constitutionality of the acts of congress which make the treasury notes of the United States a legal tender for certain purposes should not at this time be treated by a state court as a question open to discussion, those notes having practically constituted the currency of the country for five years.

---

[*] See Mr. Hale's article in 1 Amer. Law. Rev. 638.

In estimating damages, where there are different kinds of currency in use, equivalent in law, but differing in public estimation and purchasing power in the market, the damages should be computed in that which is the most common, most easily procured, by which the debtor can most conveniently, and by which it is therefore to be presumed that he will, satisfy the judgment.

THREE actions of contract brought to recover the value of certain ounces of silver due under indentures between the plaintiffs and defendants for the rent of certain mill powers on Merrimack River  The indentures were annexed to printed " Proposals by the Essex Company for the sale of their mill power and land on Merrimack River, in Massachusetts," which proposals were by the terms of the indentures adopted as a part thereof.  One of the articles of these proposals provided as follows :

" In order to continue in the grantors an interest in common with the grantees for the preservation and support of the mill powers which may be granted, and to secure a fund to indemnify the grantees for expenses which may be incurred by them for making repairs, if the grantors should improperly neglect to make them ; it is proposed that part of the consideration of every sale, and all that is to be allowed the grantors for the repairs, &c., by them assumed, should be paid or secured to them in the form of a reservation of rent.  It is therefore declared that each mill power, with the land to which it is annexed, shall forever be subject to a perpetual annual rent, of at least two hundred and sixty ounces troy weight of silver of the present standard fineness of the silver coin of the United States, or an equivalent in gold, at the option of the grantee at the time of payment; which rent is to be paid in yearly payments forever, free from all charges or deduction whatever for taxes or assessments of every description which may be assessed or levied upon any granted premises after the making of the deed, all of which are assumed by the grantees ; and a perpetual annual rent, at least equal to the above, shall be reserved for every mill power hereafter sold ; and no rent shall be reduced or extinguished by the grantors but by consent of all the grantees."

Each indenture provided accordingly for the payment to the plaintiffs, for each mill power granted, the yearly rent of " two hundred and sixty ounces troy weight of silver, or its equivalent in gold ; " payable on the 1st of March in each year forever.

The *first* action was brought to recover the value of 6930 ounces of silver, due on the 1st of March 1865, under five several indentures of the form above described.

The *second* action was to recover the value of 2860 ounces of silver, due on the 1st of March 1865, under three several indentures of the form above described.

The *third* action was to recover the value of 4160 ounces of silver, due on the 1st of March 1865, under four several indentures of the form above described.

In the *first* action, it appeared that, on the 1st of March 1865, 6930 ounces of silver were due from the defendants to the plaintiffs, of the fineness of nine parts of pure silver to one part of alloy, or an equivalent in gold; which the defendants neglected to pay. On the 3d of April 1865 the defendants tendered to the plaintiffs $8111 in gold, this sum being made up as follows:

" $26\frac{2}{3}$ mill-powers at $302.54\frac{1}{2}$, which is the equivalent

of 260 ounces of silver under the act of 1846 . $8067.87

" Add one month two days' interest . . . . 43.03

$8110.90 "

The plaintiffs declined to take this, in full settlement, but offered to take it and account for it, which offer was refused, and the gold was carried away by the defendants. It was agreed that the case should be determined as if the same had been duly paid into court.

On March 1st 1865 the market value of said silver was $2.43 an ounce, in United States treasury notes, amounting to $16,840; and on April 3d it was $1.78 an ounce in treasury notes, amounting to $12,275; and the market value thereof has been fluctuating almost daily ever since, but it has never been so high as $1.78.

The defendants also offered to prove, and if material it is to be taken as a fact, that $1.16$\frac{4}{11}$ of the silver coinage authorized by the act of 1837, and $1.25 of the small silver coinage author-ized by the act of 1853, each weighed one ounce of silver of the fineness of the silver specified in said indentures; that on March

1st, 4th and 18th, and April 3d 1865, one ounce of silver of said fineness, and thirty-one grains of gold of said fineness, (being the amount of gold contained in $1.20 United States gold coin,) were of equal market value; that if said metals of said standard fineness were in the form of coins of the United States, or of coins the fineness of which has been reported by the director of the mint, pursuant to U. S. St. 1857, *c.* 56, or in the form of bars bearing the stamp of the United States Mint or of any known assay office, certifying the fineness, the said weights of metals would each have been of the market value of $1.20 in United States gold coin.

Neither gold nor silver is merchantable or ever bought or sold in the market without its fineness being first authenticated by being coined or stamped as above. The expense of caus-ing unstamped bullion of said fineness to be cast into bars and stamped at the United States Mint is at the rate of two cents per ounce for silver, and two cents per thirty-one grains of gold, and therefore, if unstamped, said weights of metals would have been, on said days, of the value of $1.18 in United States gold coin.

The same weight of silver is not always of equal value with the same amount of gold, their values fluctuating as compared with each other.

It also appeared that the United States treasury notes are the currency in which the business of the country is carried on, accounts kept, prices stated and quoted, and values reckoned, except that as to a considerable number of imported articles the prices are given and quoted in and dealings take place for gold coin, with the express statement, expectation and agreement that they are to be paid for in gold coin, and not in United States treasury notes; also with this further exception, that the precious metals in the form of bullion are dealt in in both ways, but the dealings in coin, which are very much larger than the dealings in bullion, are mostly for treasury notes, as first stated above.

In the marine insurance business, also, it is common for the assured, if he prefers, to pay his premium in gold, upon the promise of the underwriters to pay the loss in gold.

In the *second* action, it appeared that, on the 1st of March 1865, 2758 ounces of silver were due from the defendants to the plaintiffs, of the same fineness as before stated; which the defendants neglected to pay. And the same facts above stated in regard to silver and gold bullion and coin, and United States treasury notes, also appeared. But in this case there was no tender.

In the *third* action, it appeared that, on the 1st of March 1865, 4012 ounces of silver were due from the defendants to the plaintiffs, of the same fineness as before stated; which the defendants neglected to pay. And in other respects the same facts appeared as in the *second* action.

These cases were all reserved, by *Chapman*, J., for the determination of the full court.

*B. R. Curtis & E. Merwin*, (*J. J. Storrow* with them,) for the plaintiffs. These covenants are to deliver merchandise, and are not contracts to pay money. Nothing is money except that which is made a legal tender and lawful money by act of congress. *Chapman* v. *Cole*, 12 Gray, 141. *Robinson* v. *Noble*, 8 Pet. 181, 199. *Anderson* v. *Ewing*, 3 Littell R. (Ky.) 247. *Collins* v. *Lincoln*, 11 Verm. 268, 271. *Thompson* v. *Sloan*, 23 Wend. 71. Promises to pay money may be satisfied by anything which is a legal tender; but promises to deliver merchandise cannot be satisfied by some things that are lawful money. Thus, Spanish dollars, though a legal tender, would not have satisfied the requirement of these covenants, because not of the requisite fineness.

In actions upon promises to deliver merchandise, the measure of damages is the value of the article on the day when it ought to have been delivered, with interest. *Bartlett* v. *Blanchard*, 13 Gray, 429. This rule is applied to cases where the articles to be delivered are current bank notes, or other similar articles which circulate as money. *Robinson* v. *Noble*, and *Anderson* v. *Ewing*, above cited. Otherwise, there is no rule of damages left, since the passage of the legal tender act. It is the same question which arises in every case where damages are to be assessed. A witness is called, and is asked whether, in estimating

damages, he means paper or gold. Unless the court can give to the jury some instructions as to which is the proper basis, there is no rule of damages, and the jury may find eight thousand dollars or sixteen thousand. But this is not so. See also *Mather* v. *Kinike*, 51 Penn. State R. 425; *Christ Church Hospital* v. *Fuechsel*, 54 Penn. State R. 71; *Kempton* v. *Bronson*, 45 Barb. 618· *Wilson* v. *Morgan*, 30 How. Pract. R. 391; *Rodes* v. *Bronson*, 34 N. Y. 649; *Lush* v. *Druse*, 4 Wend. 313. The use of the word "pay" in the indentures does not imply that money is to be paid. This would be a strained effect. *Rodes* v. *Bronson*, above cited. The election of the lessee to deliver silver or gold is to be made on the day when the rent becomes due. Having made no election, the promise becomes absolute to deliver the silver; and the damages are to be fixed by ascertaining the market value of the silver on that day.

This value should be estimated in United States treasury notes. These notes are lawful money and a legal tender for the payment of debts. The presumption is that defendants who have a judgment to discharge will select the less valuable currency to pay with. If necessary, the court might frame the execution so as to direct the collection thereof in paper money only. There is no rule of law and no statute which compels the court to adopt the principle contended for by the defendants, and under these circumstances the court will not declare that the distinction between the two kinds of currency does not exist, upon which the whole business of the country is based.

*J. G. Abbott & R. T. Paine, Jr.*, for the Pacific Mills. The rent reserved is, for each mill power, 260 ounces of standard silver bullion, or its equivalent in United States gold coin. The United States Statutes are the sole means of ascertaining what is the equivalent in gold of the silver bullion. By U. S. St. 1837, c. 3, § 9, one ounce of silver is equal to $1.16$\frac{4}{11}$; 6930 ounces are therefore equal to $8064.28. The rent is therefore $8064.28 in gold dollars, and judgment can only be rendered for the number of dollars thus ascertained. *Wood* v. *Bullens*, 6 Allen, 516. Even if the market value of the silver is the measure, still that

value must be computed in coined money. See *Appel* v. *Wolt-man*, 38 Missouri, 194. So computed, it amounted to $8316, on March 1st 1865. The facts show that this sum is just as much the market value as a sum computed in paper money. Many branches of traffic are conducted on a gold basis.

The election belonged to the defendants of paying the rent either in silver or gold on the rent day ; also of paying in legal tender notes or gold. *Adams* v. *Cordis*, 8 Pick. 260. The defendants have desired and are now ready to pay in gold coin. They are therefore entitled to have the damages computed in such money, and judgment entered accordingly.

If the defendants had not made such election, the court ought still to compute damages in coined money. Coin is the only standard of value known to the law. The judgment is, that the plaintiffs recover as many dollars as they are entitled to. The meaning of the word " dollars," as thus used, is to be found in the United States Statutes as to the coinage and mint. U. S. Sts. 1792, *c.* 16, § 9 ; 1837, *c.* 3, § 8 ; 1853, *c.* 79, § 1. Used in the computation of damages, the word " dollars " can only mean the actually existing standard coins. *Bush* v. *Baldrey*, 11 Allen, 369. *Hussey* v. *Farlow*, 9 Allen, 264. The courts take judicial notice of the condition of the currency, when in a state of disorder. *Jones* v. *Fales*, 4 Mass. 252. *Farwell* v. *Kennett*, 7 Missouri, 597. *Roberts* v. *Short;* 1 Texas, 382. *Lampton* v. *Haggard*, 3 T. B. Monr. (Ky.) 149. *Bank of Augusta* v. *Earle*, 13 Pet. 590. 1 Greenl. Ev. § 5. *A fortiori*, courts will allow evidence of such a state of disorder. *Neal* v. *Durrett*, 7 J. J. Marsh. (Ky.) 106. *Bonnell* v. *Covington*, 7 How. (Miss.) 323. *Warnibold* v. *Schlichting*, 16 Iowa, 248. The measure of damages is invariably declared to be the actual specie value. *Robinson* v. *Noble*, and *Anderson* v. *Ewing*, above cited. *Hixon* v. *Hixon*, 7 Humph. (Tenn.) 33. *Gordon* v. *Parker*, 2 Sm. & Marsh. (Miss.) 495. *Moore* v. *Hudson River Railroad*, 12 Barb. 158.

No argument can be drawn against this mode of computing damages, from a fear that the judgment may be paid in depreciated notes. The court cannot judicially know or assume this. Congress may repeal the laws, or paper money may rise to an equal value with coin. If the damages are computed in coin,

and paid in coin, the plaintiffs receive exact justice. But the plaintiffs claim an unfair advantage. Treasury notes are gradually approaching the coin standard. On March 1st 1865 they were worth less than fifty cents on the dollar. Now they are worth seventy cents. If then the damages are computed in a currency worth fifty cents, and paid in a currency worth seventy cents, the plaintiffs receive seventy fiftieths of their claim, measured by the only standard known to the civilized world. The rule now laid down must be the same as will be enforced when coin shall again be our only currency. How glaring will be the injustice of a rule compelling damages to be estimated in a currency worth fifty cents to a dollar, when the judgment must be paid in coin.

The court may do justice between the parties by exercising a power which has always belonged to courts of law, and ordering proceedings to be stayed upon payment of the damages computed in coin, with interest and costs. *Pickering* v. *Truste,* 7 T. R. 53. *Knott* v. *Barker,* 3 Anstr. 896. *Hopkins* v. *Shrole,* 1 B. & P. 382. *Coombe* v. *Sansom,* 1 D. & R. 201. *Earle* v. *Holderness,* 1 M. & Payne, 254. *Phillips* v. *Heyward,* 3 Dowl. Pract. Cas. 362. *Peacock* v. *Nichols,* 8 Dowl. Pract. Cas. 367. *Lucas* v. *London Dock Co.* 4 B. & Ad. 378. 1 Tidd's Pract. 544. *Atkins* v. *Chilson,* 11 Met. 112. *Davenport* v. *Tilton,* 10 Met. 330.

[There was also an argument upon the construction and constitutionality of the legal tender statutes, and the rights of the states, which is omitted.]

HOAR, J.* The contract by which the defendants engaged to deliver two hundred and sixty ounces of silver, of a specified fineness, for each mill power leased to them, on the 1st of March 1865, was a contract for the delivery of a commodity, and not for the payment of money. The alternative which it allowed, to pay or deliver an equivalent in gold, was not adopted; and if it had been, it merely provided for the substitution of another commodity. There was no stipulation that the gold, any more than the silver, should be in the shape of coined money. If it

---

* BIGELOW, C. J., did not sit in this case.

were true, as the defendants argue, that the only means of ascertaining what amount or weight of gold would be equivalent to the silver is the statute of the United States relating to coinage, it would not alter the case. The payment in either mode was to be in the precious metal as merchandise, and could be satisfied by the delivery of the just quantity, when ascertained, of the requisite fineness, in bars, as well as in coin. That it would have had a value fixed by law, if in the shape of coin, is of no importance, as it was not required to be so delivered.

The defendants did not perform their contract, and for a breach of it the usual and ordinary measure of damages is the market value of the goods which they had agreed to deliver, at the time the contract was broken, with interest from that time.

We have to determine, therefore, for what sum the damages should be assessed according to this rule, upon the facts agreed. It is agreed that the market value of the silver would be different, as it should be computed in the gold coins which the law regards as money, or in the treasury notes which the statutes of the United States have made a legal tender for the payment of debts. The defendants insist that the value should be estimated in coin. In support of this proposition, they have submitted a long and able argument to show that congress has no constitutional power to make these notes a legal tender, or to give them the qualities of lawful money. We do not regard it as consistent with the duties of this court to undertake at this time to consider or pass upon this question, as an original question of constitutional right. These notes practically constitute, and for nearly five years have constituted, the money of the country. The pecuniary transactions of the whole people have been adapted to this state of things, and interests of an incalculable amount are affected by it. The validity of the acts of congress under which they were issued has been affirmed, so far as we are aware, by every judicial tribunal in which the question has been presented; and has been recognized in various ways by the action of the state governments. There have been other acts of the national government which, however disputable on original

principles, must be taken to be practically settled by public ac-
quiescence, and the magnitude of the interests involved. The
duty of deciding the limits of the constitutional powers of con-
gress, where they affect private rights, belongs peculiarly to the
supreme court of the United States; and it is enough for us to
say that, in the absence of any decision by that tribunal, it does
not seem to us proper for a state court, upon any views of con-
struction which they may entertain, to treat the constitutionality
of a statute of the United States, which so deeply affects all the
relations of property in the community, and has been so long in
operation, as an open question.

The difference in public estimation, and therefore as a standard
of value, of two kinds of currency which the law makes equal
for the payment of debts, but which are of very unequal purchas-
ing power in the market, leads to great practical embarrassment.
But the question which this case presents is one which may
arise in every case in which damages are to be assessed, or val-
ues to be ascertained, by a court or jury. Any two witnesses
will differ, and the same witness will express different opinions,
in respect to the value of any piece of property, accordingly as
they refer to specie or paper as the standard. Perhaps the diffi-
culty arises from allowing any distinction between things which
the law treats as equivalent, to be given in evidence, or agreed
as a fact. But one or the other must be assumed as the meas-
ure of prices, and there is no more theoretical inconvenience in
taking one than the other. Whichever is adopted, the course is
open to the criticism that the damages may be assessed in one
currency, and paid in the other. We must therefore look for the
rule which will most commonly produce substantial justice as
the result. And we are all of opinion that in estimating dam-
ages, when there are different kinds of currency in use, equiva-
lent in law, but differing in public estimation and purchasing
power in the market, they should be computed in that which is
most common; most easily procured; by which the debtor can
most conveniently and cheaply, and by which it is therefore to
be presumed that he will, satisfy the judgment. The same diffi-
culty might have existed when the currency consisted of gold

and silver only, if for any reason the relative values of the two kinds of coin in the market were different from the proportion between them established by law.  This has been true at some periods, and the coinage has been altered to obviate the inconvenience.  In such a case the tendency is for the cheaper coin to exclude the other from common use.

If damages are assessed in the currency of higher value, injustice would almost always be done to the creditor, who might be obliged to take the money of less value in payment.  On the other hand, when judgment is rendered for a sum computed in the cheaper currency, although it is possible that the debtor might be wronged if the judgment creditor should levy his execution upon the money more appreciated by the community, yet this is a contingency not likely to occur.  The party who has broken his contract, if either must take the risk of loss, has the least right to complain, and he may protect himself from it by tendering satisfaction in the less valuable currency, for which he may seasonably exchange the other.

The damages are to be computed as of the day when the breach of contract occurred.  Fluctuations in the currency after that date cannot of course be regarded; and the gains or losses thereby occasioned are incident to the condition of every person who owes a debt.

The plaintiffs are entitled to judgment for the agreed value of the silver which the defendants failed to deliver under their contract, estimated in the notes which were a legal tender by the laws of the United States, with interest from March 1, 1865.  Nothing has since been tendered or offered in payment by them which was in law or in fact, when it was offered, equivalent to that sum.

It has been suggested that a special judgment should be ordered, requiring the plaintiffs to collect their judgment only in the same kind of money.  But, without suggesting any doubt of the power of the court to make such an order if justice required it, we can see no reason for it in the present case that does not exist in every case in which judgments are entered.

*Judgment for the plaintiffs.*

Judgments were thereupon entered for the plaintiffs, in the first action, for $16,840 and interest; in the second action, for $6702 and interest; and, in the third action, for $9749 and interest.