State ex rel. Postel, Appellant, vs. Marcus, Respondent.

*December 9, 1914—January 12, 1915.*
*March 6—March 23, 1915.*

*Constitutional law: Amendment of constitution: Procedure: Judicial questions: Action by legislature: Nature and requisites: Entry upon journals: Elections: Who are electors: Eligibility to office.*

1. Whether an attempt to amend the state constitution was effectual is a judicial, not a political, question.
2. Unless the constitutional requirements relating to legislative action upon proposed amendments and their submission to the people have been complied with, an amendment does not become effective, even though approved by a vote of the electors.
3. The power granted to the legislature by sec. 1, art. XII, Const., to propose, agree to, and submit to the people amendments to the constitution is not strictly legislative, but is ministerial in its character. It is not an inherent power, but is measured by

State ex rel. Postel v. Marcus, 160 Wis. 354.

the terms of the grant and must be exercised in the manner therein prescribed.

4. In said sec. 1, art. XII—providing that, if agreed to by a majority of the members elected to each of the two houses, a proposed amendment "shall be entered on their journals, with the yeas and nays taken thereon,"—the word "entered" may fairly mean either (1) entered at large, or (2) entered by title, number, or other definite or certain reference. The word is therefore open to construction; and the latter meaning having been given to it by the legislative and executive officers of the government in administering the section for more than half a century and ever since the adoption of the constitution, such practical construction is entitled to controlling weight.

5. Although the two houses make one legislature and each house has the benefit, day by day, of the journal of the other, an entry on the journal of one house is not an entry "on their journals."

6. The words "their journals" are not open to construction, because they can have but one meaning, *i. e.* the journals of the two houses severally; hence no practice of the legislature can be held to have construed the section as requiring an entry at large on the journal of the house in which the proposed amendment originated, but not on the journal of the other house.

7. The joint resolution proposing an amendment to sub. 2, sec. 1, art. III, Const., relating to electors, having been adopted by both houses of the legislature in 1905 and accurately referred to by number and title upon both journals,—its contents being made entirely certain by reference to the original records as filed and preserved in the office of the secretary of state,—and the identical resolution having been readopted by both houses in 1907, and properly submitted and duly adopted at the general election in 1908, such amendment became effective, although it was not entered at large in its final form on the journals of the two houses at the session of 1905.

8. The fundamental purposes of the procedure prescribed in sec. 1, art. XII, Const., are that there should be no amendment which was not the result of deliberate reflection on the part of legislature and people, and that there should be no possibility of an amendment being adopted without accurate knowledge of its contents.

9. Where a person is eligible to an office at the time he is elected thereto, but becomes ineligible under legal or constitutional provisions during his term, he will be allowed a reasonable time in which to remove the ineligibility before his office can be deemed vacant.

MARSHALL, TIMLIN, and VINJE, JJ., dissent in part.

State ex rel. Postel v. Marcus, 160 Wis. 354.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Affirmed.*

Action to try title of the defendant to the office of trustee of the village of Muscoda.

Defendant was, in form, duly elected in April, 1912. He, in form, duly qualified and entered upon performance of the duties of the office. He was not a citizen of the United States. He had taken out first citizenship papers. He was a resident elector of the village of Muscoda at the time of his election by reason of having so taken out first papers; but this status was subject to termination on the 1st day of December, 1912, by failure to take out final citizenship papers by that time. Sec. 1, art. III, Const. By statute, a person not a resident elector of the village, was not eligible to the office of trustee. Sec. 875, Stats. Defendant failed to become a citizen of the United States by the time limited as aforesaid and so ceased to be a resident elector of the village and eligible to office therein. He, nevertheless, continued in possession of the office until after the commencement of this action and was so circumstanced when judgment herein was rendered, his right being referable to his election as aforesaid. Some time after such commencement he became a citizen of the United States.

The court decided on such facts that, as defendant was eligible to the office when he was elected thereto, and was when the action was terminated, the period of disability as to eligibility during his incumbency, did not warrant a judgment of ouster. Judgment was, therefore, rendered in his favor.

The cause was submitted for the appellant on the brief of *Burnham & Black,* and for the respondent on that of *Otto Kuenzli.*

The following opinion was filed January 12, 1915:

MARSHALL, J. Several questions are presented for solution in this case. If either were decided in respondent's

favor it would be fatal to the appeal. The overshadowing and only one which, as will be seen, need be discussed, is whether the effort to amend sec. 1, art. III, of the state constitution, purporting to have been consummated in 1908, was successful. If not, then, though it has seemed that full citizenship instead of mere declaration in that regard was a condition of capacity to exercise the right of suffrage and of eligibility under sec. 875, Stats., the fact has been otherwise, and the judgment must be affirmed.

While dealing with the subject suggested might be avoided at this particular time, it does not seem best to do so; but rather to face the situation and solve it. Much harm may come by uncertainty as to an important constitutional question being permitted to exist until affairs, public and private, shall have been adjusted to a condition apparently legitimately created by a legislative effort;—and that is most emphatically so when such condition rests on a purported but illegitimate change in the fundamental law. The policy and duty here is rather to embrace than to repel opportunity to remove such uncertainties.

No feature of the judicial function is of equal dignity with that which requires dealing with what is and what is not, really, a part of the constitution, of those things which may have been engrafted upon the original instrument. None requires an equal degree of care to reach a right conclusion and courage to pronounce it. The court may, and should, and must, on such great occasions, look to effects and consequences. Not do so with the thought of hesitation, much less omission to do what duty to here and to the public requires; but as an inspiration to reach the highest attainable degree of certainty of the right being vindicated in the end.

The people, through their chosen instrumentalities and by subsequent direct approval, created the constitution. It was wisely conceived to be as necessary to the conservation of inherent rights as those rights are to a worth-while existence.

In their wisdom, it was thought, that it was of as much importance to have a delegated guardian to expound, apply, defend, and preserve their creation,—one independent of any other power but that of the creator, exerted in the particular way provided,—one as high up as possible above danger of being "swayed by fear, favor, affection, or hope of reward, by personal influence or public opinion,"—as to have such creation, itself.    They made a supreme court to be such guardian, and provided for instrumentalities answerable only, except in a very narrow degree, to the sovereign,—the people.

So it happens that, upon being properly interrogated on the subject, it is as much the duty of this court, even after a proposed amendment to the constitution shall have apparently traversed the entire course from initiation to official publication as the law, and have been indorsed by a majority of the people, however large, to give judicial answer thereto of approval or nullification according to the facts.

Thus, as indicated, whether an effort to amend the constitution was effectual is a judicial, not a political, question. This court inferentially passed upon that matter in *State ex rel. Hudd v. Timme,* 54 Wis. 318, 11 N. W. 785.    Other courts have done so many times and the rule in that regard has been as clearly read out of our system as it could be if placed therein in the plainest language, looking thereto in its letter.    *Edwards v. Lesueur,* 132 Mo. 410, 33 S. W. 1130; *Gabbert v. C., R. I. & P. R. Co.* 171 Mo. 84, 70 S. W. 891; *Rice v. Palmer,* 78 Ark. 432, 96 S. W. 396; *Bolt v. Wurts,* 63 N. J. Law, 289, 43 Atl. 744, 881; *Secombe v. Kittelson,* 29 Minn. 555, 12 N. W. 519; *Oakland P. Co. v. Hilton,* 69 Cal. 479, 11 Pac. 3; *Kadderly v. Portland,* 44 Oreg. 118, 74 Pac. 710, 75 Pac. 222; *Collier v. Frierson,* 24 Ala. 100; *State v. Swift,* 69 Ind. 505; *Trustees, etc. v. McIver,* 72 N. C. 76; *Sproule v. Fredericks,* 69 Miss. 898, 11 South. 472; *Crawford v. Gilchrist,* 64 Fla. 41, 59 South. 963; *Rich v. Board of State Canv.* 100 Mich. 453, 59 N. W. 181; *McBee v. Brady,* 15

Idaho, 761, 100 Pac. 97; *Ellingham v. Dye,* 178 Ind. 336, 99
N. E. 1; *State ex rel. McClurg v. Powell,* 77 Miss. 543, 27
South. 927; *McConaughy v. Secretary of State,* 106 Minn.
392, 119 N. W. 408.

The gist of those decisions on the subject and decisions, in
general, is quite tersely stated in *Crawford v. Gilchrist, supra,*
thus:

"Under our system of constitutional government regulated
by law, a determination of whether an amendment to the con-
stitution has been validly proposed and agreed to by the legis-
lature . . . is necessarily required to be in a judicial forum
where the constitution provides no other means of authorita-
tively determining such questions."

Guided by the conception of duty indicated, it has been,
with varying degrees of strictness, held by courts in general,
and must be regarded as the written law by implication and
the unwritten by long time universality of its declaration and
application, that, unless the constitutional requirements shall
have been satisfied as to manner of proposal and submission,—
though a proposition to amend shall have run the full course
of two legislatures, and been approved by a majority vote of
the electors, and the change has been, by state agencies, placed
in the official publication and recognized as having been legiti-
mate for a considerable length of time,—the fundamental law
remains the same, in fact, and it is the duty of the court to so
judicially declare, thus clearing away the cloud cast upon the
constitution by the meaningless proceedings.

Doubtless it is true, as said in some cases, that the most
important step in changing the constitution is a favorable
vote by the electors. But that does not warrant the sovereign
will being overruled as to any other step. Moreover, experi-
ence shows that, generally, exercise of the right reserved by
the people to pass upon fundamental changes, is very difficult
to secure, and that often a large proportion of the electorate
gives no personal attention to the matter. It must be pre-

sumed that such difficulty was foreseen, and so, to meet it, as far as practicable, the most careful provision was made by the people, not only to secure but to compel individual attention of legislators to, and participation by them in, considering every proposition to amend the constitution,—not only those of one legislature but of a second elected after opportunity by the people to know the purport of the proposal. It was, doubtless, supposed that the safeguards thus thrown around the matter would enable the people, upon their coming to the point of voting directly in respect to such a proposition, to have the benefit of that individual considerate judgment of the members of the legislature which they had provided should occur. So they, in effect, created a disability for themselves to efficiently pass upon a legislative proposition to change the state charter, in advance of the creation of the condition precedent they so carefully provided for their protection against danger of unwise attempts to change it.

A constitution which is to stand as the charter by which to test, to guard, and to afford practicable individual and collective enjoyment of, inherent rights, is not like a code of ordinary law. The distinction is well put in Jameson on Constitutional Conventions (4th· ed.) 84–86: .

"Ordinary laws are enactments and rules for the government of civil conduct. . . . They are tentatory, occasional, and in the nature of temporary expedients. Fundamental laws . . . are expressions of the sovereign will in relation to the structure of the government. . . . Fundamental laws are primary, being the commands of the sovereign establishing the governmental machine, and the most general rules for its operation. Ordinary laws are secondary, being commands of the sovereign, having reference to the exigencies of time and place resulting from the ordinary working of the machine. . . . Fundamental laws are either structural, or expressive of the *settled policy* of the state . . : *laid down in advance, for ages to come, whilst* . . : ordinary laws are merely temporary expedients or adjustments."

He might well have added as an epitome of all: Fundamental law is law made by the people in such manner, at first, as they may determine to express sovereign will and, as to changes, made by them by the predesigned fundamental procedure. Ordinary written law is law made within constitutional restrictions by the legislature. The latter is necessarily subject to frequent changes to meet new conditions, or broaden or narrow old ones, which may be of a somewhat permanent or of quite a temporary nature. The former is, in the main, a direct sovereign declaration of principles evolved from long experience, conservative of, or necessary to, efficient vitality of the basic idea of human government and adaptable to conditions *in præsenti* and so far into the future as human foresight can reach, thus rendering necessity for any change quite remote, and danger of any undue attempt in that regard likewise remote.

The danger mentioned was especially guarded against by the procedure designed to secure the most careful individual attention of the members of two legislatures to a proposal to amend the constitution before submitting it to the people, and to produce conviction in the minds of the voters before exercising their final judgment in the matter that the proposal had received that attention and, so, might well have reasonable doubts resolved in its favor.

That the people, until recent years, acted upon that theory is evidenced by the fact that but few attempts were made during the fifty years subsequent to the adoption of the constitution to amend it, and, in general, they were successful; while, latterly, another view has been taken, as shown by changes in great number having been acted upon by the legislature, no less than eighteen at the last session, and all which reached the ultimate step were disapproved at the polls. If that means that confidence in legislative consideration of such matters has been weakened, the record in this case shows sound basis for it; and to the end that there may be as efficient re-

turn to the safe methods which the framers of the constitution designed, the matter has been brought to the attention of the court none too soon.

Enough, perhaps, has been said to show a logical basis for the idea that the people created their own disability to pass by their votes upon a legislative proposal to amend the constitution in advance of its having reached the proper stage by a particular road.

The legislature in executing its function does not legislate, in a technical sense. The result does not need the approval of the governor. The duty is ministerial in character. There is good reason why the manner of procedure, so far as material—and the people must be presumed to have settled the question of what is material—must be followed. The power to make law, within fundamental limitations, is inherent in the division of the government formed for that purpose. It does not need any express grant, but does not include making or proposing fundamental law. The power to so propose is a special grant and must be exercised within the scope of the grant. Well said in *Ellingham v. Dye,* 178 Ind. 336, 99 N. E. 1, quoting with approval from *Oakland P. Co. v. Hilton,* 69 Cal. 479, 11 Pac. 3:

"The power given to the legislature is a grant of power. It has it not without the constitutional provision. The grant is given to be exercised in the mode conferred on the legislature by the constitution. It is so limited by the people acting in the exercise of their highest sovereign power. In such case, the mode is the measure of the power. Its action outside of the mode prescribed is as much a nullity as that of a board of supervisors of a city outside of the statute defining its power in regard to the grading of a street. The rule . . . is just as applicable here, for the constitutional provision is a statute ordained by a people as part of its paramount law: . . . The legislature, acting outside of the constitution, is without jurisdiction and its action null."

Much might be written, in a general way, leading up to and as a firm basis for consideration of the particular question we are called upon to decide; but, perhaps, enough has been said in a prefatory and basic way. Were the principles involved, or as treated by the courts, new, on account of their import- ance now, particularly, because of the possible results of our conclusion upon other attempts to change the fundamental law, we should feel justified in going much further.

We may say, in passing, that it is believed the possible re- sults mentioned do not extend backward many years. Until confronted with the necessity for dealing with such a situation as the one here presented, and coming to appreciate the under- lying principles of fundamental law and the importance of submitting to be ruled thereby, the idea that the people, by their own creation, deliberately put such disability upon them- selves to change the result of their original effort that their favorable vote upon a legislative proposal cannot lift the bar unless such proposal reaches them in the prescribed way, seemed quite strange and, may be, to some, rather illogical; but the contrary is the fact, and will become manifest to one who examines the subject carefully. As said in *Ellingham v. Dye, supra:*

"The idea of the people thus restricting themselves in mak- ing changes in the constitution, is original, and is one of the most signal evidences that amongst us liberty means not giv- ing rein to passion or to the thoughtless impulse; but the ex- ercise of power by the people for the general good and, there- fore, always under restraints of law."

Perhaps there is no greater danger to worth-while liberty and equality than that of undigested, undemonstrated by ex- perience, ideas of well-meaning innovators and idealists, be- ing, unwittingly, attached to our system of government with the power of inseparability which inheres in fundamental law. The constitution has, in the judgment of its framers, within

itself, the most efficient protection practicable against such danger; but the most perfect instrumentality that human ingenuity can invent, is useless if not given proper direction to do its work by the contemplated human vitalizing force.

From 1882 to the attempt in question to change sec. 1, art. III, of the constitution, it, so far as relates to this case, was worded thus:

"Section 1. Every male person, of the age of twenty-one years or upwards, belonging to either of the following classes, who shall have resided in the state for one year next preceding any election, and in the election district where he offers to vote such time as may be prescribed by the legislature, not exceeding thirty days, shall be deemed a qualified elector at such election:

"1. Citizens of the United States.

"2. Persons of foreign birth who shall have declared their intentions to become citizens conformably to the laws of the United States on the subject of naturalization."

After such attempt sub. 2 took this form in the official publication:

"Persons of foreign birth who, prior to the first day of December, A. D. 1908, shall have declared their intentions to become citizens conformable to the laws of the United States on the subject of naturalization, provided that the rights hereby granted to such persons shall cease on the first day of December, A. D. 1912."

The recorded history of such change may be thus told: At the legislative session of 1905, a resolution was introduced in the Assembly to amend such section and was entered on the Assembly Journal thus:

"Jt. Res. No. 16, A.

"Joint resolution striking out paragraph 2 of section 1, article 3, of the constitution of the state of Wisconsin.

"*Resolved by the assembly, the senate concurring,* that

section 1 of article 3, of the constitution of the state of Wisconsin, be amended by striking out paragraph 2 of said section."

In due course, the resolution was reported by the committee to which it was referred with recommendation for passage of a substitute. The nature of the substitute was not entered upon the journal. In further proceedings to final action, that situation was not changed. In the various steps the journal record was confined to giving the number of the resolution, its origin, and reference thereto as a resolution "providing for an amendment to section 1 of article III of the constitution, relating to electors." The original title was discarded after the first entry. Under the substitute title and the committee amendment, very materially changing the original proposition, the resolution was adopted in the Assembly by the requisite vote. Nothing in respect thereto except the substitute title was spread upon the record.

Upon the action of the Assembly being reported to the Senate, it was thus entered on the Senate Journal: "Jt. Res. No. 16, A. Joint resolution providing for an amendment to section 1 of article 3 of the constitution relating to electors."

Further proceedings were recorded by similar or less definite journal entries. The finality was recorded under this journal entry: "Jt. Res. No. 16, A., was read a third time and concurred in. The ayes and noes being required, it was decided in the affirmative: Ayes, 22; noes, 7; absent or not voting, 3," followed by the vote in detail.

At the legislative session of 1907, a proposition purporting to be the one agreed upon before was again considered. The first step was recorded under this journal entry of Assembly proceedings: "Read first and second times and referred. Jt. Res. No. 47, A., by Mr. Schauer, to committee on Elections." Further proceedings until the finality were recorded under a mere reference to "Jt. Res. No. 47, A." In its course an

amendment was proposed and adopted without any journal entry being made, except this: "Substitute Amendment No. 1, A., to Jt. Res. No. 47, A."

The last journal entry is as follows:

"Jt. Res. No. 47, A.   Joint resolution to amend section 1 of article III of the constitution, relating to electors.

*"Resolved by the assembly, the senate concurring,* That subsection 2 of section 1, of article III of the constitution of the state of Wisconsin, be amended so as to read as follows: 2. Persons of foreign birth who, prior to the first day of December, 1908, shall have declared their intentions to become citizens conformable to the laws of the United States on the subject of naturalization, provided that the rights hereby granted to such persons shall cease on the first day of December, A. D. 1912.

"Was read a third time at length.

"The question was, Shall the resolution be adopted?

"The ayes and noes being required, it was decided in the affirmative: Ayes, 86; noes, 4; absent or not voting, 10. . . ."

The first record in the Senate is this: "Jt. Res. No. 47, A.," with a statement of the committee reference.

In due course and without any more suggestive journal entry, this appears: "Substitute amendment No. 1, S., was offered by Senator Martin and adopted.  The question was, Shall Jt. Res. No. 47, A., as amended, be concurred in?  The ayes and noes being required, it was decided in the affirmative: Ayes, 22; noes, none; absent or not voting, 11," followed by a statement of the vote in detail.

Further record in the Assembly appears under various repetitions of "Jt. Res. 47, A.," up to the last showing concurrence in the Senate substitute, no indication appearing of the nature thereof.

Does the procedure thus had satisfy sec. 1, art. XII, of the constitution which provides as follows:

"Any amendment or amendments to this constitution may be proposed in either house of the legislature, and if the same shall be agreed to by a majority of the members elected to

each of the two houses, such proposed amendment or amendments shall be entered on their journals, with the yeas and nays taken thereon, and referred to the legislature to be chosen at the next general election, and shall be published for three months previous to the time of holding such election; and if, in the legislature so next chosen, such proposed amendment or amendments shall be agreed to by a majority of all the members elected, then it shall be the duty of the legislature to submit such proposed amendment or amendments to the people in such manner and at such time as the legislature shall prescribe. . . ."

It is significant that if the proposition "shall be agreed to," etc., it "shall be entered" on the journals of the two houses, "with the yeas and nays taken thereon." That means that the proposition as agreed to must be so entered, and that the agreement is a condition precedent to the mandatory requirement as to entry on the journals. If entered at some time during the progress of the proceedings with such reference thereto on such associate or connecting entries as to show clearly that, as so entered, it was agreed to by a recorded yea and nay vote, it would doubtless be sufficient; but since the language seems to suggest association of the entry with the vote, the better way would be, even though the proposition were entered when introduced, to re-enter it in connection with the yea and nay vote. That is, really, the only absolutely safe way in case of changes having occurred after the introduction and, most especially, where the action of remodeling affords no information of the nature of the changes.

While the requirements at the second session do not include any express direction as to entering on the journals of the two houses, the proceedings otherwise being the same, the safe way,—the only really careful way,—is to make the journal entries, regardless of the initiatory action, by recording the proposition *in extenso,* in connection with the record of the essential yea and nay vote, thus making a complete record of the proposition on the journals of the two houses at each ses-

sion, in connection with the record of the yea and nay vote, in respect thereto.

The course indicated would observe the constitutional command with technical accuracy. Why not so follow it in a matter of such dignity as that of taking administrative steps, pursuant to granted power, to enable the people, intelligently and with full assurance of the judgment of the legislature, to act on such a very important matter as changing the fundamental law? Nothing could evidence more plainly a growing want of appreciation of the need of constitutional restraints than progressive disrespect for, or negligence in respect to, the wise safeguards erected to secure a high degree of deliberation and care in making fundamental changes. When such progression reaches the point of treating the subject, so far as appears by the official history, with no more care than is devoted to the most ordinary legislation, it is well to open wide our sensibilities to that admonishment of the fathers: "The blessings of a free government can only be maintained . . . by frequent recurrence to fundamental principles."

The words "entered on their journals" must mean entered as agreed to,—sometime, at least, at the first session, on the journals of each house. The legislative practice when the constitution was adopted was for each house to keep a journal history of its proceedings. The words "their journals" are too plain to be open to construction. Any attempt to do so by reading out of the language the meaning that an entry on the journal of one house is an entry "on their journals" because the two make but one legislature, and each branch has the benefit, day by day, of the journal of the other, would be an arbitrary way of evading the plain meaning the framers of the constitution had in mind.

We cannot well avoid concluding that, at the first session for acting upon a proposition of the kind under consideration, no efficient action can occur without entry of it, as agreed to, upon the journal of each house and, if a sufficient entry be

made at first, in case of any change of the proposition, there must be an entry showing the nature thereof, so that, in the end, the journal will exhibit the amendment as finally agreed to by the yea and nay vote.

We are inclined to hold that the journal entries with the fulness suggested at the second session, are not essential, because the express requirement for the first session is not repeated as to the second.    However, the spirit of the initiative is so carried forward to the end, that we have no hesitancy in holding that the scrupulous care which should be exercised in such a matter, ought to efficiently admonish spreading the proposition, *in extenso,* on the journal of each house at each session, in connection with the yea and nay vote thereon.

In the great number of instances where the courts of this country have treated the subject under discussion, there is no feature so often and so fully discussed as that involved in the word "entered."    Many have held expressly or in effect, to a broad comprehensive meaning, requiring full recording of the proposed amendment in such close connection with or relation to the yea and nay vote as to show the precise matter acted upon.    The following are illustrations: *Koehler v. Hill,* 60 Iowa, 543, 14 N. W. 738, 15 N. W. 609; *McMillen v. Blattner,* 67 Iowa, 287, 25 N. W. 245; *State ex rel. Bailey v. Brookhart,* 113 Iowa, 250, 84 N. W. 1064; *Oakland P. Co. v. Hilton,* 69 Cal. 479, 11 Pac. 3 (overruled later); *Ellingham v. Dye,* 178 Ind. 336, 99 N. E. 1; *McBee v. Brady,* 15 Idaho, 761, 100 Pac. 97; *State ex rel. Stevenson v. Tufly,* 19 Nev. 391, 12 Pac. 835; *Kadderly v. Portland,* 44 Oreg. 118, 74 Pac. 710, 75 Pac. 222; *Prohibitory Amendment Cases,* 24 Kan. 700; *Worman v. Hagan,* 78 Md. 152, 27 Atl. 616; *Nesbit v. People,* 19 Colo. 441, 36 Pac. 221; *Oakland P. Co. v. Tompkins,* 72 Cal. 5, 12 Pac. 801; *State ex rel. Adams v. Herreid,* 10 S. Dak. 109, 72 N. W. 93; *Cudihee v. Phelps,* 76 Wash. 314, 136 Pac. 367.

It will be seen upon examination that the decisions in Iowa

head those holding that "entered" means spread *in extenso;* that the second *Oakland Paving Company Case* in California, rather leads as to the idea that entry of the title on the journals satisfies the constitutional requirement; and that the Kansas case goes to the length of holding that substantially all requirements are directory except the one that there shall be a yea and nay vote on the proposition in each house at each of the two sessions, and that there shall be approval by a majority vote of the electors voting on the same. Only a few of the large number of cases at hand have been cited. It is believed that substantially all to be found in the books have been examined.

Nothing further need be said to demonstrate that there is an irreconcilable conflict in the authorities. In each instance of the birth of a theory upon which an amendment to the constitution can be supported notwithstanding more or less looseness in respect to following the fundamental mandate as to procedure, a line of logic was adopted which met a difficult situation and made a troublesome precedent. In that way constitutions may easily be weakened or superseded by judicial construction or determination as to what is directory and what is mandatory, what is material and vital and what is immaterial and may be omitted. That may be carried so far as to not only weaken the fundamental law but breed disrespect for a constitutional system.

If the legislature may disregard the letter of the fundamental law, in its most material particulars, and the court may ingeniously bend its provisions or say that it means one thing when, in its letter, it means another, and thus adapt it to a dangerous legislative tendency to regard its provisions lightly or not at all,—certainly, there is great danger of its failing to fully accomplish the great purpose of the people in the beginning. That purpose should be sturdily adhered to until the people see fit, in the way designed therefor, to indicate that something different is to prevail.

What right has the court to say that any part of the con-

stitution is immaterial or directory, or that its plain reasonable words do not mean just what would be ordinarily supposed? It seems that courts should presume the people meant just what they said in using the language: "If the same shall be agreed to . . . such proposed amendment or amendments shall be entered on their journals." We have no more right to change it than the legislature. It would be much more unbecoming here to attempt it than for the legislature, purposely, or negligently, to overlook it.

It would extend this opinion to a very great length to take up and discuss, even a goodly part of, the decisions respecting the subject here dealt with. If we were entirely free to choose the position which seems to us most logical, with the plain letter of the constitution before us, we should incline to the declaration in *State ex rel. Hudd v. Timme,* 54 Wis. 318, 11 N. W. 785: No amendment can be made to the constitution without complying with the provisions of sec. 1, art. XII, both in the passage of the amendment by the legislature and in the manner of its submission.

True, the particular matters material now were not when the cited case was decided, but the principle involved is the same now as then. Adhering to that, as it seems we ought, we cannot follow *Prohibitory Amendment Cases,* 24 Kan. 700. Indeed, we quite agree with the expression of the California court, though later it was weakened there, somewhat, that "the reasoning by which the learned court reached the conclusion it did is not based on any sound legal principles, but contrary to them. Neither the argument nor the conclusion can command our assent or approval. The argument is illogical, and based on premises which are without any sound foundation, and rest merely in assumption."

We must reason from these premises, which are recognized by all the cases in the first class and nearly all in the second, though they commonly quote the Kansas case without appearing, always, to appreciate the extent of it.

In proposing an amendment to the constitution the legis-

lature does not exercise its legislative function. The authority given by the people to the legislature to propose amendments to the fundamental law is independent of its inherent power to make law. It is a grant of power, ministerial in character. Since the power rests in grant, and not inherency, it is measured as to extent by the terms of the grant.

The method provided by the constitution for executing the grant of power to propose amendments to the constitution, is with reasonable strictness, "binding upon the people and the legislature."

It must be presumed that every feature of the grant of power to the legislature to propose amendments to the constitution, was deemed by the people in making such grant to be material, and neither the legislature nor the court has jurisdiction to ignore it.

The people featured the manner of executing the grant of power to propose amendments to the constitution, as they did, to secure deliberate individual legislative judgment with precise knowledge of the matter to be passed upon and for assurance that when they should come to act upon the matter at the polls they would have the benefit of such judgment for guidance.

Standing upon such premises the conclusion easily follows that the decision in *State ex rel. Hudd v. Timme, supra,* though the matter was then little discussed and no authority was cited, is sound.

To hold that a mere identifying reference which does not, on inspection, suggest the purport of an amendment, satisfies the mandate as to entry on the journals, is to emasculate the particular provision most effectually.

The word "entered" must have a sensible construction to carry out the intent with which it was used, not an unnatural one—under the circumstances, justified only because of its being within the broad scope of the word—to meet the necessities of a particular situation. Far better that such a situ-

ation be judged as involving fatal infirmity than that a basic principle the people incorporated into the fundamental law be superseded and a bad precedent created, fruitful of future mischief.

With all proper deference to the eminent jurists who have held that an identifying journal reference to a proposed amendment satisfies the constitutional requirement, we cannot so hold. We could not as an original proposition, nor without overruling *State ex rel. Hudd v. Timme, supra.* If such a reference will suffice, what is the necessary scope of it ? Will a mere resolution number or a title, neither of which the constitution requires, do ?. If nothing special was intended by the language chosen to express a definite material matter, why was not the procedure left to be governed by ordinary legislative rules ? If a mere identifying journal reference, such as to number of the resolution, with, perhaps, a brief suggestion that the purpose is to amend the constitution, or a particular part thereof, which might be made in the course of legislative consideration long in advance of the precise formulation agreed upon, why the particular language, "if (as) agreed to it shall be entered," etc. ? Why select of the many meanings reasonably ascribable to the word "entered" the one which would often be meaningless as regards the real purpose the creators of the constitution had in mind, yet would, in a sense, satisfy the term, in preference to one which would evidence the fact as to whether the members of the legislature had in mind in taking the requisite yea and nay vote, the precise proposition acted upon, such as "to inscribe, to enroll, to enter with particulars of an account?" Webster, New Internat. Dict. "To cause to be inscribed or enrolled." Cent. Dict. Thus, notwithstanding some holdings to the contrary, it seems clear that if the constitution is to be upheld according to the design of it, the step mentioned as to the particular matter must be followed with substantial accuracy. That, as indicated, requires an amendatory pro-

posal, at the first legislative session to be, as agreed to, spread
upon the journal of each house in such connection as to evi-
dence that, in such form, it was the subject of a successful
yea and nay vote. Not, necessarily, that it must be so re-
corded when first suggested, but at some time before, or in
connection with the record of the vote, so with reasonable defi-
niteness, to connect the two matters.

The result of the great labor devoted to the subject of how
best to amend a constitution without unduly weakening the
necessary stability of the fundamental law, has been treated
rather too lightly by some courts. They seem to have failed
in appreciation of the fact that the method of amendment in-
corporated into most of the constitutions of this country is but
a crystallization "of the accumulated wisdom of the ages."
No part of it was deemed otherwise than matter of substance.
In Jameson's Constitutional Conventions (4th ed.) § 529,
it is well said that the problem of the constitution makers in
this field is "one of the most difficult in our whole system, to
reconcile the requisites for progress with the requisites for
safety." The particular procedure by which the legislature,
in lieu of a convention, is given power to propose fundamen-
tal law, indicates the sovereign conception of "the requisites
for safety."

In the light of such distinguished commendation of Mr.
Jameson's work as that of Judge COOLEY and others of sig-
nificant eminence, his statement of the following, cited from
the Iowa court with *State ex rel. Hudd v. Timme,* 54 Wis.
318, 11 N. W. 785, as an illustrative authority, is entitled to
a place here:

"When the existing constitution prescribes a method for its
own amendment, an amendment thereto, to be valid, must be
adopted in strict conformity to that method; and it is the duty
of courts, . . . to inquire whether, in the adoption of the
amendment, the provisions of the existing constitution have
been observed, and, if not, to declare the amendment invalid
and of no effect." § 574e.

The learned text-writer quoted from gives special attention to the fact that the legislature, in proposing to the people a change in the fundamental law, does not exercise legislative power. As before indicated, such power is strictly ministerial in character,—authority delegated by the people within precise limitations,—therefore it must be exercised within its prescribed scope and in the manner directed. That is apparent on principle and from the very nature of the matter. This court has not spoken on the subject prior to this, but in many other jurisdictions the subject has been treated, and the nature of the authority has been, all along, the guide to judicial footsteps. *McBee v. Brady,* 15 Idaho, 761, 100 Pac. 97; *Oakland P. Co. v. Hilton,* 69 Cal. 479, 11 Pac. 3; *Livermore v. Waite,* 102 Cal. 113, 36 Pac. 424; *Koehler v. Hill,* 60 Iowa, 543, 14 N. W. 738, 15 N. W. 609; *Collier v. Frierson,* 24 Ala. 100; *State v. Powell,* 77 Miss. 543, 27 South. 927; *State v. Cox,* 8 Ark. 436; *Edwards v. Lesueur,* 132 Mo. 410, 33 S. W. 1130; *Warfield v. Vandiver,* 101 Md. 78, 60 Atl. 538; *Miller v. Johnson,* 92 Ky. 589, 18 S. W. 522. So exercise of this delegated ministerial power must be viewed as in other cases of like grants. Validity of activity is dependable upon keeping within the scope of the grant. A fundamental restraint upon legislative activity within the law-making field, is a limitation of power to make law. A delegation of authority to propose amendments, is a grant of power. The efficiency of every act under the latter is dependable upon the integrity of the grant being vindicated in performance.

Thus, we reiterate, it happens that the people, themselves, have no authority to pass upon the question of whether a legislative proposal shall be written into the fundamental law, unless it shall have been submitted to them in the manner they prescribed in exercise of their original right to create a form of government. It follows, logically, that it is of no avail for the people by their votes to approve a proposed change of

the constitution, if it shall not have been submitted in such manner as they in their sovereign authority provided. Otherwise such approval, however emphatically pronounced, does not authorize writing the proposition into the basic law.

Referring back to the history of the proceedings in the particular case, fatal infirmity therein is plain. To restate in brief: The proposal at first was to strike out par. 2 of sec. 1 of art. III. Thereafter that was discarded and the body was materially changed. The new title did not disclose the nature of the proposal nor was the substitute entered. That condition persisted to the end. A like defective record appears on the Senate Journal. At the second session the proposal was first offered in the Assembly and read first and second times without any record of title or subject matter being made. After adoption of an amendment without any formal record showing how it changed the original proposition, the resolution was brought to a vote as a proposition to amend sec. 1, art. III, of the constitution relating to electors, and the proposal, *in extenso,* was entered, but it does not check up with any previous journal entry. In the Senate the proposal was amended and concurred in; but how, as finally agreed to, it conforms to anything which previously was voted on, does not appear of record.

It is thought that the situation described hardly satisfies even the so-called liberal rule, outside of the *Kansas Prohibitory Cases.* They, as we have seen, gave no greater dignity to the constitutional requirement as to the journal entries, than that of mere directory regulations.

Whether an amendment of the constitution purporting to have been adopted, actually incorporated into the published fundamental law, and acquiesced in for a great length of time, characterized by important public and private interests having grown up on the faith of its having been duly proposed and approved,—would be proof against some such departures as those above indicated, need neither be now as-

serted or denied. A condition might well be imagined, created by long continued unquestioned, and supposed unquestionable state of the fundamental law and such adjustment of public and private matters thereto, that a judicial determination of invalidity would be fraught with calamitous consequences, calling into activity all the reserve power, so to speak, of the court to legitimately deal with it and prevent such penalty. The court reasoned along that line, successfully, in *Prohibitory Amendment Cases,* 24 Kan. 700, as a supplementary support for the main ground of the decision. The California court, after rejecting both grounds, in *Oakland P. Co. v. Hilton,* 69 Cal. 479, 11 Pac. 3, came very near, if not quite to the point of adopting the second ground, later, in *Oakland P. Co. v. Tompkins,* 72 Cal. 5, 12 Pac. 801. The first ground would seem to be the more logical in circumstances justifying its application.

It may be that principles exist appropriate for solution of such a situation as the one suggested. One would not care to venture, unnecessarily, the decision that there is none which would apply to the exigencies of such a case. The principles of justice which seem to have precise limitations as to all ordinary situations, are often expansible to cope with great emergencies to the end that the very safeguards created to conserve rights be not used so as to destroy them. It were better, it seems, to accord to words their common, ordinary meaning, and which in all fair probability was in mind in the particular instance, and let the natural consequences follow, or to lay hold of some principle broad enough to save the latter without sacrificing the former and usurping the functions of constitution making. The fact that calamitous consequences will follow from obedience to law, does not excuse its violation. A law without a penalty for its violation is of no more strength than a rope of sand.

We should say, as companion to the foregoing, that if the emergency course were efficiently open in any case of this

sort, lapse of more time and a fundamental change affecting the form or essentials of the state government in far greater degree, and consequences of a much more serious nature, than in the particular case, would be required to justify resorting to any extraordinary application of principles to avoid the results of a manifest inefficient effort to amend the constitution.

It follows from what has been said that sub. 2, sec. 1, art. III, of the constitution, was not changed by the attempted amendment thereof, culminating in the vote on the proposal to that end at the November election, 1908. It is now as before, to wit: "Persons of foreign birth who shall have declared their intentions to become citizens conformably to the laws of the United States on the subject of naturalization." Therefore respondent was eligible to the office in question when this action was commenced, and the judgment in his favor was properly rendered.

*By the Court.*—The judgment is affirmed.

The following opinion was filed January 15, 1915:

WINSLOW, C. J. (*concurring*). I agree with the result reached for the following reasons: The people provided in the constitution that any proposed amendment to the constitution should be agreed to by two successive legislatures before being submitted to the people, and that it should be entered on the journals of both houses by the first of such legislatures. It cannot be said that this last requirement was supposed to be trivial or unimportant; it was one of the means deemed essential to insure the greatest publicity and prevent anything like railroading an amendment through. This was not done with the amendment under consideration. The amendment, therefore, was not adopted in the manner prescribed by the people. In holding that the command of the constitution must be obeyed, this court simply performs its plain duty.

On February 27, 1915, the court ordered that a rehearing be had in the action upon the following questions only:

1. In view of the history of constitutional amendments in the past, should it now be held that a constitutional amendment must be spread at length in its final form upon the journals of both houses at the first session?

2. If not, should it be held that it is sufficient that it be entered at length in its final form upon the journal of one house and so referred to on the journal of the other house as to be clearly identified?

3. Is it sufficient if the journal entry in either of the above cases simply states the substance of the amendment?

4. Can a journal entry of a proposed amendment by title only be considered sufficient in any event?

It was further ordered, among other things, that the attorney general be invited to intervene and file a brief and participate in the argument as *amicus curiæ.*

The cause was reargued on March 6, 1915.

*Otto Kuenzli,* for the respondent.

Upon the invitation of the court there was a brief by the *Attorney General* and *Winfield W. Gilman,* assistant attorney general, *amici curiæ,* and oral argument by *Mr. Gilman.*

By request of the governor, *B. R. Goggins* and *George Lines* also appeared as *amici curiæ,* filed separate briefs, and argued the case orally.

On March 23, 1915, the decision of the court was announced as follows:

PER CURIAM. Upon the argument of the rehearing ordered by the court, it is held:

1. That the amendment to sec. 1 of art. III of the constitution in question in this case was legally adopted.

2. That notwithstanding that fact the judgment in the present case was rightly affirmed, because the defendant within a reasonable time and before the entry of judgment in this case became a fully qualified citizen of the United States.

An opinion will be filed at an early date more fully setting forth the grounds of the court's holding.

At the same time there was also filed the following memorandum, prepared by

MARSHALL, J.   The court, by a majority of the justices consisting of the Chief Justice, Justices SIEBECKER, KERWIN, and BARNES, having announced a decision to the effect that, in a legislative proposal of an amendment to the constitution the proposition need not, necessarily, be spread, even in substance, on the journal of either house at either session,—I dissent therefrom and adhere to the decision first rendered to this extent:

The constitution as administered so long that the manner thereof should be regarded by force of practical construction to indicate the intent of the framers of the fundamental law, requires a proposal to amend the constitution to be entered in substance on the journal of the house of origin at the first session and be referred, to upon the journal of the other house in such manner as to clearly connect such substantial entry with such reference; that an entry by mere number or number and title is not sufficient nor is an entry *in extenso* necessary but that a proposal which does not at least conform as regards the journal history to the indicated necessity cannot become a part of the fundamental law; so the instant proposal did not become such.

An opinion at some future time will be filed by one, at least, of the justices concurring in the foregoing.

I am authorized to say that Justices TIMLIN and VINJE concur with the writer in the foregoing memorandum.

The following opinions were filed April 13, 1915:

WINSLOW, C. J.   The importance of the constitutional question in this case, and the possible adverse effect of the deci-

sion upon the validity of many other important amendments
to the constitution, led us, in the absence of a motion for re-
hearing by the defeated party, to order a rehearing of our own
motion, in which the attorney general was invited to partici-
pate on behalf of the state.   Our object was that we might as-
sure ourselves that we were right, or that we might ascertain
and correct our error, if error there was, before the case
passed beyond our control.   "A man should never be ashamed
to own he has been in the wrong, which is but saying in other
words that he is wiser today than he was yesterday."

The reargument has now been had and it is but fair to the
counsel who participated in it to say that we have gained much
light from the briefs and arguments presented.   The chief
proposition under discussion on the rehearing was the propo-
sition declared in the former opinion to the effect that, unless
the supposed amendment in its final form be entered at large
at some time during the first session upon the journals of *both*
houses, it cannot be held to have been legally adopted, not-
withstanding all other required steps be taken in accordance
with the commands of the constitution.

Is this proposition sound?

As an original question, we still think that such was prob-
ably the intended meaning of the words used in sec. 1 of
art. XII of the constitution.   That section says that if the
proposed amendment be agreed to by a majority of the mem-
bers elected to each of the two houses it "shall be entered on
their journals, with the yeas and nays taken thereon."

In view of the evident desire to give publicity and accuracy
to the proposed amendments and prevent an amendment from
sailing under false colors or passing without complete knowl-
edge of its provisions, it seems very reasonable to suppose that
the word "entered" here was intended to mean entered at
length.   This, however, is not its necessary meaning.   If so,
it would never be necessary to say entered *at length,* or *at
large,* or *in extenso,* as we frequently do where we wish to

leave no doubt as to our meaning. It may be admitted that it is most frequently used in this latter sense. Webster's International Dictionary gives this definition: "To inscribe, enroll, to record; as to enter a name or a date in a book, *or a book in a catalogue.*" Of course, the entry of a book in a catalogue means that the title is entered,—not the book copied at length, and so also a book is said to be "entered" under the copyright laws of the United States when its title page has been filed in the proper office. A judgment is "entered" in the circuit court journal by noting only memoranda of its contents. Sec. 2901a, Stats. Other examples of the use of the word in the sense of a mere memorandum will readily occur to any one.

So the word is plainly one not absolutely certain and fixed in its meaning, but a word which is most frequently used in one sense but not infrequently in another sense, and hence is open to construction. In considering the proper meaning to be attached to such words, the principle is familiar that preponderant weight will frequently be given to the practical construction given to them for a long series of years by those departments of the government which have been charged with the duty and responsibility of administering or giving effect to them. This proposition has been applied in the construction of another command of this very section of the constitution. *State ex rel. Hudd v. Timme,* 54 Wis. 318, 11 N. W. 785.

It is to this question that we have devoted our attention upon this re-examination of the case: Have the legislative and executive officers of the government in administering this section of the constitution given a practical construction to the words in question which is now entitled to controlling weight?

This question was not raised or passed upon in the trial court. The judgment there was based upon grounds which will be later considered, and went upon the assumption that the amendment was legally adopted. It is true that the respondent's attorney raised the question in this court in sup-

port of the judgment and printed in his brief excerpts from the journals of the two houses showing the failure to spread the amendment at large on the journals of the houses. No attempt was made by the appellant, however, to meet the proposition by showing how the word "entered" had been practically construed in the past, and it seems that no adequate examination of the question was made here. Such examination has now been made, however, and we are in possession of its results.

From that examination it appears that of the twenty-five amendments to the constitution which have been proposed and supposedly duly adopted since the organization of the state, only six have been entered at large upon the journals of *both* houses at the first legislative session; twenty-two out of the twenty-five were entered at large on the journal of the house where they respectively originated; two were entered in substance as first introduced, *i. e.* the substance of the proposal was briefly stated; and one was not entered either at large or in substance but only by number in both journals.

The amendment which is now before us was one of the two above referred to as entered in substance in the form in which it was first introduced. It was introduced in the Assembly February 8, 1905, the journal entry being as follows:

"Jt. Res. No. 16, A.

"Joint resolution striking out paragraph 2 of section 1, article 3, of the constitution of the state of Wisconsin.

"*Resolved by the assembly, the senate concurring,* That section 1 of article 3, of the constitution of the state of Wisconsin, be amended by striking out paragraph 2 of said section.

"To committee on Judiciary."

Turning to the original resolution as found in its appropriate envelope filed with the secretary of state at the close of the session, we find it to read as follows:

"Joint resolution No. ——. Resolved, by the Assembly, the Senate concurring, that Section 1 of Article 3 of the con-

stitution of the State of Wisconsin be amended by striking out
paragraph 2 of said section."

On May 11th it appears by the Assembly Journal that it
was reported back by the committee with substitute amend-
ment.   The substitute was not entered at large on the journal,
but, again consulting the original documents in the envelope
above referred to, we find it there indorsed on the outside,
"Sub. for joint resolution No. 16, A., providing for an amend-
ment to Section 1 of Article III of the constitution relating
to electors."   It reads as follows:

"Substitute for joint resolution No. 16, A., providing for
an amendment to Section 1 of Article III of the constitution
relating to electors.

"Resolved by the Assembly, the Senate concurring, that
Subsection 2 of Section 1 of Article III of the constitution of
the State of Wisconsin be amended so as to read as follows:
2. Persons of foreign birth who, prior to the first day of De-
cember, A. D. 1908, shall have declared their intentions to
become citizens conformable to the laws of the United States
on the subject of naturalization, provided that the rights here-
by granted to such persons shall cease on the first day of De-
cember, A. D. 1912."

It further appears by the Assembly Journal that this sub-
stitute (referred to by number and title only) was, on May
16th, ordered engrossed and read a third time, on May 22d
adopted by yea and nay vote entered on the journal, and on
May 26th messaged to the Senate.   At the time of its adop-
tion it was entered on the journal by number and title only,
thus: "Jt. Res. No. 16, A.   Joint resolution providing for
an amendment to section 1, of article 3 of the constitution,
relating to electors."

It appears by the Senate Journal that it was there entered
by number and title only and was concurred in by aye and no
vote entered on the journal June 13, 1905, and messaged to
the Assembly as concurred in June 14, 1905.

Here ends the history of the resolution at the first session.

It was not entered at large or in substance upon the journal of either house in the form in which it was finally passed, but only by number and title.

In 1907 the resolution as passed at the previous session was introduced in the Assembly as joint resolution No. 47, A., on February 13th. It had the same title as in 1905, but the word "conformable" appeared as "conformably," the Roman numeral III was changed to 3, and two or three other slight inaccuracies appeared, not affecting in any way the meaning, such as the use of a capital letter instead of a small letter and the insertion of the word "Section" before the figure 2 at the beginning of the proposed subsection.

The resolution was referred to the committee on Elections, was reported back March 25th for passage with amendments (simply correcting the immaterial variances above noted), and adopted by yea and nay vote April 10, 1907, at which time it was entered in the Assembly Journal at large in its final form. It was messaged to the Senate April 11th and entered by number and title only. On June 11th the following was adopted by the Senate as a substitute amendment and entitled "Sub. Amd. No. 1, S., for Jt. Res. No. 47, A.:"

"Joint Resolution
"To amend Section 1 of Art. III of the constitution relating to electors.

"Whereas at the biennial session of the legislature for the year 1905 an amendment to the constitution of this state was proposed and agreed to by a majority of the members elected to each of the two houses, which proposed amendment was in the following language:"

[Here follows the joint resolution exactly as passed in 1905.]

"Therefore resolved by the Senate, the Assembly concurring, that the foregoing proposed amendment to the constitution be and the same is agreed to by this legislature."

This so-called substitute was entered on the Senate Journal by number and title only, and adopted by a duly recorded yea

and nay vote on June 11th and messaged to the house, where it was again entered by number and title and concurred in by yea and nay vote.

The substitute really added nothing and changed nothing. The fact is that the identical resolution adopted by both houses in 1905 was re-adopted by both houses in 1907.   There is no claim that it was not properly submitted to the people and properly adopted at the general election in 1908.   So it is certain that the only defect in the proceedings which can be claimed to exist is the failure to enter the resolution at large in its final form on the journals of the two houses at the session of 1905.

Is this a defect, and, if so, is it fatal in a case where the resolution is accurately referred to by number and title upon both journals and where its contents are made entirely certain by reference to the original records as filed in the office of the secretary of state?   This is the question which we must fairly meet.

We are all of opinion that, in view of the legislative history · of the constitutional amendments in the past, it should not now be held that entry at large upon the journals of *both* houses is imperative.   All agree that there has been a long continued practical construction of the word "entered" by the legislative branch of the government, which forbids such a holding at the present time, consequently the court recedes from its former position upon this question.   All are not agreed, however, as to the effect of this legislative practical construction.   I have been authorized by the majority of the justices to express as best I may their views upon this question, and these views, by reason of the fact that they are held by the majority, become the views of the court.

The constitution requires that the proposed amendment, if agreed to by a majority of the members elected to each of the two houses, "shall be entered on *their* journals."

The constitution makers recognized that each house had its

own journal because they industriously used the plural. They made absolutely no distinction between the two journals. What was required to be entered upon one journal was required to be entered upon the other. If the word entered means "entered at large," it means entered at large upon both of the journals alike, and the entry at large upon one does not fulfil the command any more than entry at large upon neither. Remembering this, it becomes at once evident that there has been, since the adoption of the constitution, a practical agreement by the legislative department of the government that the word "entered" does not mean entered at large, but entered by number, title, or by such other descriptive reference as makes identification certain. In nineteen cases out of the twenty-five the legislature has practically said, "We construe this command as not requiring entry at large." These nineteen cases begin in 1865 and run down to the very last amendments adopted. They include some of the most important amendments which have been made to the constitution, amendments which have entered into the very warp and woof of our state government, like the amendments abolishing the compulsory grand jury system, prohibiting special legislation on various subjects, increasing the membership of this bench, providing for the taxation of incomes, authorizing the expenditure of state money for improvement of highways, limiting the powers of municipal corporations as to the incurring of indebtedness, and the like.

Now it does not seem to the court that it is logical to say that because the great majority of these amendments were in fact entered at large upon the journal of the house in which they respectively originated, therefore the legislature has practically construed the word entered to mean "entered at large upon the journal of the house of origin." As before pointed out, what the constitution commands as to one house it commands as to the other, and so plainly that no one could mistake it. Apparently there were just two constructions pos-

sible: (1) entry at large on both journals; (2) entry by title, number, or other definite and certain reference on both journals. No intermediate construction was logically possible, and consequently, when legislature after legislature has deliberately said that entry by title and number in one house is sufficient, it has at the same time and by the same act said that entry by title and number in both houses is sufficient.

To say that because, in the majority of instances, the resolution was entered at large in the house of origin, although not in both houses, the legislature therefore must have construed the command of the constitution to apply only to the house of origin, is to convict the legislators of the past of inability to understand plain English language, for the constitution says nothing which can be logically so construed.

We deem it our duty to give their acts a construction which vindicates them from such an implication. The entry at large on the journal of the house of origin would be natural enough without any command on the subject, especially in the case of a brief amendment. It is in no sense a disobedience of the constitution whatever the construction of the word "entered," and that fact deprives such an entry of great significance. The failure to enter it at large upon the journal of the other house, however, is vastly significant because, if the legislature understood that "entered" meant "entered at large," then they must also have understood that the failure to enter it at large in the journal of the second house meant disobedience of the constitution. It should always be kept in mind that practical construction can only be resorted to when words are used which are fairly capable of two meanings,—not when words can have but one meaning. The word "entered" may properly be the subject of practical construction, because it is capable of two meanings. The words "their journals" are not open to construction, practical or otherwise, because they can have but one meaning, i. e. the journals of both houses, and cannot be made to mean anything else. A practice which attempts

to make them mean the journal of one house is to our minds not practical construction but practical destruction.

We reach the conclusion that ever since the adoption of the constitution the legislative and executive branches of the government, as well as the people themselves, have construed the word "entered" as meaning simply entered by title, number, or brief description in such manner as to make identification certain; that this is a permissible and not unusual meaning of the word; and that such meaning must now be held to be controlling under the well established principles of practical construction.

The conclusion which we have thus reached as to the practical construction given to the words for half a century and more and the controlling effect of such construction at the present time renders unnecessary any consideration or discussion of the authorities, many of which are cited in the first opinion in this case, in which is discussed the meaning of the word "entered" occurring in similar clauses of other constitutions and in most of which cases the question is considered as an original proposition, free from the considerations which seem compelling to us in the present case.

It is not out of place, however, to call attention to the fact that the construction given to the word by the legislature has many potent considerations in its favor, and not the least of these is the fact that in the only other clause of the constitution which prescribes what notation shall be made upon the journal on reception by the legislative body of a written document, namely, the reception of a veto message from the executive (sec. 10 of art. V), it is provided that the house "shall enter the objections *at large* upon the journal." The industrious inclusion of the words "at large" in this provision seems to clearly show that the constitution makers well understood that the word "entered" alone might rightly be construed as meaning entering by title or other intelligible reference only. If they had that understanding and used the word in one

place with the addition of the words "at large" and in another place without such addition, the argument is strong that they meant by the first named provision that the entry must be at large, and by the second that it need not necessarily be so.

There are other considerations of a more general nature, however, which are entitled to greater weight.

In prescribing the methods to be followed in amending the constitution the makers of that instrument evidently had two fundamental objects in mind, namely: (1) that there should be no amendment which was not the result of deliberate reflection on the part of legislature and people, and (2) that there should be no possibility of sneaking an amendment through without accurate knowledge of its contents.

They wished to safeguard the constitution—not to petrify it. They did not aim to make an amendment impossible or unnecessarily difficult, but they did aim to guard against haste and immature thought. They desired that it should be the result of deliberate reason rather than of sudden and temporary emotion or passion. To effect this result they deemed it best that two legislatures should approve it before its submission to the people.

The requirements that the proposed amendment be entered on the journals and that the yeas and nays should also be entered are subsidiary requirements in the sense that they do not themselves constitute the ends sought to be attained, but only the proof that those ends have been accomplished. Remembering this fact and remembering also that every joint resolution receives a number upon its introduction, is at once printed, and is laid in printed form on the desk of every member of the house of origin, together with a copy of the journal, on the following day, may it not be logically argued that every substantial constitutional requirement has been complied with if the resolution be entered on the journal by number and title only? In connection with this inquiry it is to

be remembered also that not only the original resolution but all of the amendments and substitutes are preserved by the chief clerk in an appropriate envelope, that every action taken is noted on the outside of the resolution, and that all these papers are ultimately filed in the office of the secretary of state and carefully preserved. With these safeguards it seems that the possibility of mistake or fraud is practically nonexistent, and that entry by number or title or descriptive reference is just as effective a method of preserving proof that the desired fundamental requirements have been complied with as entry at large.

Whether these arguments and considerations would be absolutely controlling were the question an original one without historical background we need not now determine. Taken in connection with the legislative history of more than half a century we can entertain no doubt as to our duty.

This conclusion does not, however, necessarily result in a reversal of the judgment in this case.

The defendant was at the time of the election a voter and eligible to hold the office in question, and remained so until December 1, 1912. The trial court held that he was entitled to a reasonable time after that date in which to become a full citizen before he could be. ousted, and that he had made his application and received his citizenship papers at what appeared to be his earliest opportunity after the constitutional amendment became effective. We are unable to say that the court was in error as to the fact that the defendant made his application to become a citizen at the earliest reasonable opportunity.

It appears to be the law that when an officer, eligible at the time of his election, becomes ineligible under some legal or constitutional provision during his term, he will be allowed a reasonable time in which to remove the ineligibility before his office can be deemed vacant. *State ex rel. Att'y Gen. v. Messmore,* 14 Wis. 163; *State ex rel. Ives v. Choate,* 11 Ohio, 511.

This holding seems reasonable and just, especially in a case like the present where the incumbent has the same capacity and fitness to perform his official duties as before.

The judgment therefore remains a judgment of affirmance as before.

VINJE, J. (*dissenting in part*).    I concur in the affirmance of the judgment on the grounds stated in the majority opinion, but I dissent from the construction given the constitution to the effect that it is sufficient to enter an amendment by title or number only in the journals of both houses.    We all agreed when the case was first decided that the plain intent of the language of the constitution required the entering of the proposed amendment in full upon the journals of both houses at the first session.    Such is still the construction which we all agree should be placed upon the language were it not for a different one given it by the legislature ever since the adoption of the constitution, and the jeopardy in which it would place other amendments.    Owing to such practical construction and the serious consequences to other amendments that might result from an adherence to our original interpretation, we all agree that we must permit the legislative construction to control.    What is that construction?    Out of twenty-four amendments adopted, omitting the one under consideration, six were entered at large as passed upon the journals of both houses at the first session; twenty-two out of the twenty-four were entered at large as passed upon the journal of the house of origin, and one more was so entered in substance, leaving only one entered by number in both journals.    It would seem from this record of the passage of constitutional amendments that the practical legislative construction requires at least the entry at large or in substance of the proposed amendment in the journal of the house of origin at the first session.    To require less than this is to give a meaning to the constitution that is justified neither by its language nor by usage.    The amend-

ment under consideration as passed was not entered upon the journal of either house in full or in substance. It was entered only by number and title.

Is there an impelling necessity which requires it to be declared valid though not properly entered? This state and many states of the Union for over half a century have permitted resident aliens who have taken out their first papers to vote and to hold office. No substantial harm would result to the state or to any resident thereof if such policy were continued till the constitution could be lawfully modified to accord with the amendment now held valid. Therefore, since the construction now given the constitution by the majority cannot be justified on the ground of either necessity, original interpretation, or legislative usage, it has, in my judgment, no sound judicial basis on which to rest.

I content myself with this brief statement because I understand that one or both of my brethren who dissented will in a separate opinion or opinions cover the ground more fully.

The following opinions were filed April 15, 1915:

MARSHALL, J. (*dissenting*). I do not dissent from an affirmance of the judgment, but do from the method of it. I cannot recognize that there has been a rehearing, strictly so called. None was proper for reasons stated in *Hocks v. Sprangers,* 113 Wis. 123, 135, 87 N. W. 1101, 89 N. W. 113. I adhere to the decision that the purported amendment to the constitution is not a part of the fundamental law. Perhaps a modification of the reasons therefor is within the spirit of *Hocks v. Sprangers,* but to give the late proceeding the cast of a technical rehearing and practically reverse the former judgment as upon such, though affirming it in fact, exceeds what this court has many times said it has the power to do, after the time fixed therefor in the statute, as was the case here. Whether the many previous decisions on the subject

are wrong and the term "want of power" should, at most, be read as, ought not to exercise power, may admit of some question. If so, the matter should be met in a considerate way and, perhaps, a new doctrine be promulgated. In my judgment it rather takes from the dignity of the court to cast practice of fifty years aside with an appearance of the court being confronted with some great emergency,—some overruling necessity of saving public and private interests from impending disaster,—which moved it with strong hand to a desired result. I am not conscious of there having been any such emergency. There was none in fact, as I shall endeavor to show, though there might have been such supposed, but that will appear so infirm that there is danger of the mere supposition being regarded as a pretext to shrink behind, as was suggested by Justice PAINE in *Kneeland v. Milwaukee,* 15 Wis. 454, is sometimes the resort of courts.

I must pause to say, I cannot doubt, but what my brethren were convinced of there being some peril impending which warranted the novel action, and that they did their duty as they saw it, regardless of its unpleasantness. It is judicially noble to hold the desire to be right high above any effect upon personal reputation for stability. For that the majority are entitled to all honor. I am pleased to accord it notwithstanding the somewhat radical nature of my dissent. If it be a fact that the majority were impelled to the result indicated in the opinion from thought of necessity, though none, not the slightest, existed, and no call, at best, for more than a modification of the reasons for holding the amendment not a part of the constitution, the result has almost a pathetic cast. I may, possibly, be wrong about this; but with the highest respect for my associates I feel in duty bound to write as I have and shall. It is more for the future than the present. Upon the calm level of the years to come we may safely rest for vindication if right and must suffer criticism if wrong.

No one will venture to say but what the logic by which the

purported amendment was condemned is supported by the great weight of judicial and text-book authority, and would never have been departed from as an original matter. That is freely confessed in leading opinions elsewhere. Sufficient on that are cited in the first opinion here. Many might be added.

The duty of upholding the constitution according to the intent of its framers has always been supposed to be one of the very highest character. Ready and wide departures from it to satisfy the calls of practical construction have been condemned by most eminent jurists and text-writers. Where indulged in at all it has, in general, been minimized to the actual necessities of the case and the strict limitation of the practice. So much so that duty in that regard is a part of the unwritten law. One of the most eminent writers upon constitutional law thus forcibly pointed out the error and danger of lightly dealing with mandatory words of the constitution to accord with legislative practice:

"In all we have said upon this subject we have assumed the constitutional provision to be mandatory. . . . The fact is this: that whatever constitutional provision can be looked upon as directory merely is very likely to be treated by the legislature as if it was devoid even of moral obligation, and to be therefore habitually disregarded. To say that a provision is directory seems, with many persons, to be equivalent to saying that it is not law at all. That this ought not to be so must be conceded; that it is so we have abundant reason and good authority for saying. If, therefore, a constitutional provision is to be enforced at all, it must be treated as mandatory. And if the legislature habitually disregard it, it seems to us that there is all the more urgent necessity that the courts should enforce it. And it also seems to us that there are few evils which can be inflicted by a strict adherence to the law, so great as that which is done by the habitual disregard, by any department of the government, of a plain requirement of that instrument from which it derives its authority, and which ought, therefore, to be scrupulously observed and obeyed." Cooley, Const. Lim. (6th ed.) 179.

That may well be read in connection with this by another eminent writer, cautioning against departing from the ordinary meaning of words in a constitution in order to accomplish a particular result:

"As the constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words they employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed."

In connection with the foregoing, we must call, more pointedly, attention to the peculiar circumstances under which the first position of the court has been radically overruled.

It is frankly admitted that, as an original proposition, the first opinion is right. No one doubted, when the case was decided, but what it was demanded by the meaning the framers of the constitution probably intended to express by the words they used and the meaning the people attributed thereto when they adopted the fundamental law. If there were anything not fully understood and appreciated it was the legislative practice. No one would venture to say that the first opinion was not written with strict fidelity to the decision agreed upon, nor that there was not full opportunity to consider it, nor that it was not unqualifiedly approved. So solicitous was the Chief Justice to have the vital point made perfectly plain and significant that he thought best to make the position of the court emphatic by stating it concisely, stripped of all discussion, which he did in a separate opinion. That was followed by the decision in the forestry case (*State ex rel. Owen v. Donald, ante,* p. 21, 151 N. W. 331) which had been previously argued, where the principles stated in this case were reaffirmed. True, there was a special defect which was unquestionably fatal and on which the cause turned

as to the amendment feature, but all the questions involved here were fully discussed by counsel in that case.

The forestry case was decided some forty-two days after the opinion in this case was filed and after the time for a rehearing had expired, and such opinion had been published in the advance sheets of the Northwestern Reporter, and specially published by the legislature. Yet no question was raised here but what it was right. It was, in the main, grounded on the decision in *State ex rel. Hudd v. Timme,* 54 Wis. 318, 11 N. W. 785, with which no one will venture to say it was not in harmony.

It was fully appreciated by the writer, and I think by some other of the justices, that there might be other purported additions to the fundamental law which would not stand the stated test of validity, though, if so, it was not, for a moment, thought that they could be disturbed to great public detriment in case of their having been actually agreed upon by both houses of the legislature, adopted by the people, and acquiesced in without question for a considerable term of years. That was stated, suggestively but advisedly, in the opinion, with numerous well considered authorities at hand to vindicate it, if necessary. It was supposed, at least, by some of us, that settled principles of law properly applied would efficiently stand guard to prevent any calamitous consequences following a firm, logical, sensible, efficient vindication of the fundamental law substantially in the spirit of its adoption by the people and that it were better to resort to them than to override the evident purpose of the people in adopting it. That was most emphatically said. There was ample conception of such principles and consciousness of courage to apply them so far as necessary. There, as said in *Kneeland v. Milwaukee,* 15 Wis. 454, "the constitution was made for the safety and protection of the people and not to be used as an instrument of destruction." A practice, originating in error, may, under some circumstances, come to have the force of law with the limita-

tions herein mentioned. In that light, springing from our conceptions of legal logic and the doctrine of our own and other courts, the decision deliberately, considerately, and fearless of personal consequences was rendered, though not without most earnest consideration of whether public interests would be imperiled by thus taking the constitution as it was believed by all was intended, and if so, whether there was room, on principle, for some more liberal view.

After all, by groundless, inconsiderate, but confident and persistent declarations from the outside, largely, I think, *ab inconvenienti,* it came to be thought by some, that the decision, practically, nullified most of the amendments which had been supposed to have been made to the constitution, and that even all the positions on our own bench but three were jeopardized. Such and the most dire consequences were suggested would probably follow from the decision, particularly as regards the court itself. I confess that such notion seemed to me so groundless, in view of well recognized saving principles, that I did not take it seriously. It seemed so baseless that I supposed the winds would pass by, reason resume its customary sway, and all would come to appreciate that the constitution, as it was intended, had been vindicated; that designed original dignity had been given to it; that the people of our commonwealth who sensed its importance to life, liberty, safety, and happiness, and so loved and cherished it, would feel a greater sense of security than before and would have greater confidence than ever in the competency, the ability, the disposition, and the courage of their tribunal charged with the duty to protect it in all its integrity to fill the full measure of its great function.

In view of the foregoing that the condition was created here leading the court, on its own motion, to institute and direct the proceeding which has resulted, as we see, puzzles the mind. I, perhaps, am not in a proper state to survey the wreck of the stately work the court wrought at first, or appreciate the idea which came up out of the ruins. I do not

say this in any spirit of conscious superiority of judicial judgment. I feel no such. I have such confidence in the collective judgment of my four associates who have spoken in the opinion by my Brother WINSLOW, that, notwithstanding my firm conviction that they are wrong, and it is reinforced by the judgment of my Brothers TIMLIN and VINJE, I should not write as I have and shall, were I not, seemingly, compelled by duty to do so and thus round out the history of this unfortunate case. All will be recorded. The future will judge between the adverse views. I am content with that. If those which are controlling are as clearly wrong as I believe them to be, they are mortal and truth will rise again. Error cannot long withstand the assaults of logic, especially when it hinges upon so slender a thread as does the majority opinion in this case.

What has been said will be seen not to be beside the subject properly treatable in such an opinion as this, when it is appreciated that it is written to picture the novelty, as evidentiary of error, in the result dissented from. It must be confessed that it is without precedent, but that does not count for much if, on principle, it is justifiable. This court has been accustomed to ignore mere precedent, and none too much when there is a right to be vindicated and a real necessity for action. I have not been wanting in progressive spirit along those lines, as what I have written for the court and otherwise will amply show. But was there a right to be vindicated in this case, and if so, was there a dire necessity for doing it in a manner and under circumstances which, as I think, reflect unfavorably upon judicial dignity, stability, and regularity, and otherwise weakens the court by the appearance of not only reaching for opportunity to recede; but improving it, and in the retrogression, passing the starting point and, unnecessarily, barriers where it could easily and logically have reformed its lines and, impregnably and with real dignity, intrenched itself?

This court, on another memorable occasion, gave most em-

400 SUPREME COURT OF WISCONSIN. [Mar.

State ex rel. Postel v. Marcus, 160 Wis. 354.

phatic expression to requirement for overwhelming necessity to justify it in changing a decision, undoubtedly right from an original standpoint, as the first opinion here is confessed to be. There was such a change in *Kneeland v. Milwaukee,* 15 Wis. 454. The court reached a conclusion, somewhat by balancing the consequences of going forward against those of going backward. The agony of the situation was most intense because of the great public peril apprehended. Justice Paine confessed that duty, in the ideal sense, required a judge to declare according to his convictions, regardless of effects and consequences; yet that, even the judicial mind is so apt to shrink before supposed disastrous results as to, consciously or unconsciously, take refuge in some plausible pretext, which would otherwise have been considered insufficient, justly subjecting courts to the criticism of being guilty of usurping law-making functions and declaring the law to be as judges think it should be rather than as they think it is in fact. He declined to yield to any such influence at first, but was overwhelmed by the necessities of the case at last, seeing no other way to avoid supposed calamitous consequences. His associate, Chief Justice Dixon, with most pathetic reluctance took the initiative, protesting that if the first decision which had been relied upon had been made a matter of record, he would not be intimidated by the menace of public calamity into changing it so long as he believed it to be right. The court finally did change such decision and returned to the earlier unrecorded determination though firmly believing it, *res integra,* to be wrong. That retrogression happened upon the theory that, because of the calamitous consequences which would otherwise occur the court was justified in regarding the long practice under the decision, founded in error, to have the force of law and be beyond the power of any but the law-making power to change it. The long struggle which so resulted, the extreme reluctance with which it was approached, the spirit of overwhelming necessity which was a constant ex-

citer, and the sense of humiliation, mixed with a high order
of courage which characterized the end, inculcated the lesson
that a decision believed to be right from an original stand-
point, should never be changed upon ground of mere expe-
diency, and not changed upon the pretext of wrong without
some fairly sound basis therefor, and then only so far as jus-
tified by the necessities of the case.

Now what is the real logic of the retrograde in this case?
That ought to be made plain.   The majority would not have
assumed such responsibility without being impelled to it from
a sense of duty.  Notwithstanding suggestions to the contrary,
there is no one here, and it is thought no reputable number
anywhere, who believes personal consequences cut any figure.
What were the real reasons?   We have no way of knowing
but from the opinion.   We have carefully read it, and reread
it to that end, hoping to give due credit thereto.

It is suggested that the court made a mistake in the first de-
cision and, inferentially as it seems, that it made a mistake
in *State ex rel. Hudd v. Timme,* 54 Wis. 318, 11 N. W. 785,
to which I have referred.   Mistake of what,—not one of law,
evidently, in the strict sense of the term, since it is confessed
that, *res integra,* the first decision is right; that the meaning
attributable to "entered on their journals" is the natural or-
dinary one.   If not a mistake of law, then it must be one of
fact, or of mixed law and fact, which the court committed.

If there was a mistake of fact, what was its nature and in
what particular did it consist?   Was it in not going deeper.
into the legislative practice, as bearing on the question of
whether the particular words are ambiguous and, if so, in not
appreciating legislative construction?   If not, was it in re-
spect to the history of the particular amendment?   If not
that, then was it in respect to the weight of authority else-
where, and state of our own decisions?   If not that, could it
have been in the meaning the people attributed to the particu-
lar term when they adopted the constitution?   If neither of

those suggested or some or all of them, was it in not stretching some old principle to the cast of a new one, *ex necessitate*, to guard against some real or imagined great peril, with the thought that the result was justified by the exigency? One must determine these propositions to justly conclude upon the relative merits of the adverse judicial positions.

If the mistake is of the first kind, then this query is suggested: Why was the full legislative practice given in the final pronouncement not stated? Why was the omitted part overlooked or not appreciated, and did that turn the scales which were so evenly balanced?

If practical construction is the rule in such a very important matter, all must agree that the entire practice should be understood and referred to. The circumstantial facts and all of them, should be established beyond a reasonable doubt, and all be consistent with the theory adverse to the original meaning of the mandatory words of the constitution, or the latter should prevail. That is the established rule and the only safe one to go by in dealing with the fundamentals. In the end, the former decision, which no one will venture to say is not right from an original standpoint, should not be disturbed further than necessary to harmonize with the practice. That is the logical scope of the rule of practical construction. It should be strictly limited to the reason for it, especially in dealing with the fundamental law.

It will be noted that the majority opinion mentions the fact that practically all the twenty-five propositions to amend the constitution which were, in form, adopted by the people, were entered in full, or substantially so, in the journal of the house of origin at the first session of the legislature and that one fourth of them were so entered in both journals. Why point solely to the twenty-five when that gives but a mere minor item of the whole? By much labor the legislative history of all proposals to amend the constitution, from its origin to date, found in over a hundred journals and covering some

300 such incidents was completed. It was thus shown that about ninety-two per cent. of the proposals prior to 1897 were entered like the twenty-five and most of those which were not were evidently thought to be inconsequential or were inadvertently not entered. Who will suggest that the history of the hundreds which failed are of any less importance on the question of legislative understanding than that of those which did not? Looking at the whole, could a word-picture of a legislative idea be much more perfect? If practice may be so long continued and uniform as to turn words out of their ordinary orbit and satisfy the calls for an original meaning in harmony therewith, then it seems the rule has been clearly misapplied in this case.

Another fact, within our reach, might well have been stated in the effort to find a sound basis in the practice for departure from the intent the people purposed embodying in the constitution. The particular section, as phrased, originated in Michigan as a part of its constitution of 1835. It was adopted from there with the existing practice. That had been uniformly, to enter a proposal to amend the constitution, at least, in full on the journal of the house of origin at the first session. In that is seen a clear explanation of the practice adopted and followed, persistently and consistently here, for over half a century. It would seem that if the provision in question is open to practical construction, and there ever could be a practice so long continued and convincing as to make a rule of law, this seventy years of history ought to be so regarded.

The idea adopted by the majority that the term "entered on their journals" points to both as plainly as to either, and that the practice of not following the entirety in practice made a rule of displacement for the whole, seems to me strikingly illogical. I am utterly unable to understand it. If it is not a novelty in practical construction, or if it is not really outside of the rule, then I confess ignorance of what such con-

struction means. "Entry on their journals" points as plainly to an entry showing the full nature of the proposal as it does to both journals. That seems to be conceded. Why then should not "entry on their journals" so far as uniform practice goes, be held to be required, if the practice is to prevail at all? As well might the entire constitution be cast into the discard because some part of it has been ignored in practice, as to hold that the entire requirement for entry on the journals may be regarded as directory because, in practice, only part has been followed.

Some significance was given on the argument and is in the decision to the circumstance that, in sec. 10, art. V, of the constitution, it is provided that in case of an executive veto the bill shall be returned to the house of origin with the objections, and that such objections shall be entered "at large upon the journal,"—the idea being that the word "entered" in the amendment provision was considerately used in a narrower sense than "entered at large on" in the veto provision. Probably that suggestion would not have been made, or if made considered, if it had been appreciated, as the fact is, that the requirement in the veto provision, as in our constitution, was adopted from the constitution of Michigan and adopted there from the constitution of the United States of which it formed a part from the beginning. Thus it will be seen, that it is hardly possible the difference in the two expressions came about from any idea that "entered" in the amendment provision should be taken other than in its ordinary sense.

There is much reason why the stronger expression was used as to the veto provision. It was doubtless appreciated that a veto message might be very long, that members might need to refer thereto often, and that merely filing it with the clerk, or entering it according to the clerk's notions of its substance, would come far short of satisfying the necessities of the case. So, *ex industria,* the term "entered at large" was used. A

proposal to amend the constitution, was customarily a concise declaration of a principle requiring but a few words. In that case, "entered on their journals" did not need any explanatory or emphasizing clause to indicate the intent, especially in framing the constitution in the light of the history for fifteen years in Michigan.

The second suggested ground of mistake which one unfamiliar with the case might indulge in, must be rejected. A full history of the amendment is given in the opinion by my Brother WINSLOW; but it is only a repetition of what can be found in the first opinion and was iterated and reiterated, again and again, before the case was first closed. The amendment was not entered at all at the first session, except by number and a very meager title which did not disclose the substance of the proposal. That was understood all along. The original papers were produced at first and the whole matter fully understood and placed upon the record.

The mistake could not have been in respect to the weight of authority elsewhere, nor the position of this court taken in *State ex rel. Hudd v. Timme,* which has been cited time and again by courts and text-writers to support the doctrine of the first opinion. I understand that no one questions but what the general trend of authority elsewhere, as to the meaning the people probably intended is as stated in the former opinion.

If it were otherwise, I would take time to reduce the matter to a demonstration.

With the concessions expressly and inferentially found in the majority opinion, I must conclude that the real mistake thought to have been made was in not taking the practice of the legislature as indicating the purpose of the people in adopting the constitution, and extending that so out of its scope as to make of the whole constitutional provision, a mere directory requirement. The danger,—the real wrong involved in that,—is well stated in the quotations from eminent text-

writers found in the opening pages of this opinion.    If that
was the idea it was not even justified, if that were possible,
by the necessities of the case, as we shall see.

It does not seem best to spend time with the suggestion
that "entered" might be regarded as having a narrower mean-
ing than spread in full or in substance.    That is beside the
case in face of the fact that the common ordinary meaning
is as indicated in the first opinion and the view of all that it
was probably used in that sense in the fundamental law.    To
refer to meanings confessed to be foreign to the thought of
those who made and adopted the constitution, as justification
for holding that only a constructive entry was intended, and
hardly that, I think will be regarded as an indication of weak-
ness and not worthy of being referred to as even one of those
"plausible pretexts" spoken of by Justice PAINE in the *Knee-
land Case,* in which the judicial mind is sometimes wont to
take refuge in the endeavor to escape from real or spectral
disastrous results.

Thus we have shown that, while the rule of practical con-
struction is relied on, the real premises were only partly
stated, and the rule itself was not applied according to the
reason of it.    There was not read out of language found to
be ambiguous a meaning sanctioned by practice, but the prac-
tice departure, was laid hold of for a ground of rejecting the
concededly intended meaning, then there was a return to the
latter for a requirement of some sort of an entry on each
journal, and then both the practice meaning and the confessed
originally intended meaning were rejected by a process of
reasoning which is far from satisfying.    If such a course is
permissible, to my mind a written constitution may easily be
recast to suit not only disregard of it, but notions of what
might well take its place.    Seemingly, the majority has said:
the meaning of the words "entered on their journals" shall be
neither the common ordinary nor the uniform practice mean-
ing; but shall be a meaningless or mere directory require-

ment, because the practice meaning has uniformly been different from the ordinary one.   I do not think there is anything in the rule of practical construction or established principle which warrants such an excursion to a resting place far beyond the boundaries of the reason for such rule.   If there were the excuse of necessity to prevent disastrous results, I could understand it if I did not approve of it.   But no such necessity existed.

Not one of the twenty-five amendments to the constitution of any great public importance would have failed of judicial approval had the limit of the practice been taken as the limit of departure from ordinary meaning.   By such restraint, the fundamental intent would have been essentially left efficient. Furthermore, if practical construction had been applied in its integrity, and anything of consequence had been left unguarded, the doctrine of estoppel would have effectually restrained any efficient attack upon it.   If that had been appreciated at the beginning of this unfortunate controversy, I think the constitution would have been saved in all its integrity.   The following authorities amply bear this out: *Kneeland v. Milwaukee,* 15 Wis. 454, 512, 519; *Nesbit v. People,* 19 Colo. 441, 452, 36 Pac. 221; *Secombe v. Kittelson,* 29 Minn. 555, 12 N. W. 519; *People ex rel. Elder v. Sours,* 31 Colo. 369, 74 Pac. 167; *People v. Maynard,* 15 Mich. 463; *Bingham v. Mills,* 17 Ohio, 445, 448; *Essex v. Pacific Mills,* 96 Mass. (14 Allen) 389, 398; *VanNada v. Goedde,* 263 Ill. 105, 114, 104 N. E. 1072; *Stuart v. Laird,* 1 Cranch, 299; Dodd, Rev. of State Const. 222.   The writer had most all these authorities and the general principle well in mind when the first opinion was written, particularly the unqualified indorsement of it in the *Kneeland Case.*   Hence his inability to appreciate why the after condition which was so slow in developing should have been aroused at all.

I will now rest this matter confident that the judgment of the future will be that, if the first opinion should be modified

at all, there is no warrant for it in practical construction or even in the *dernier resort* of necessity, beyond holding as I indicated, with concurrence of Justices Timlin and Vinje, when this case was decided, that is:

The constitution,—as administered so long that the manner thereof should be regarded by force of practical construction to indicate the intent of those who made it, requires a proposal to amend it to be entered, at least in substance, on the journal of the house of origin at the first session, and be referred to upon the journal of the other house in such manner as to clearly connect such substantial entry with such reference; that an entry by mere number or number and title is not sufficient nor is an entry *in extenso* necessary; but that a proposal which does not, at least, conform, as regards the journal history to the indicated necessity, cannot become a part of the fundamental law; so the instant proposal did not become such.

To that extent I was willing to bend to the views of the majority, thinking there was a sound basis for it and hoping, thereby, that the court might avoid making a decision on so important a matter by such a division that, even the stability of the result, would necessarily be regarded as very uncertain.

I still think that the better way would be to adhere to the first opinion.    I feel confident it were better for the court and| for the people if that could remain unchanged.    Its soundness as an original matter no one doubts, as before indicated. I would stay by it firmly and so uphold the constitution in all its integrity and dignity, and in the spirit of *Marbury v. Madison*, 1 Cranch, 137.    It is the very sheet anchor of our life, liberty, and happiness.    The people made it.    We are sworn to support it as they made it until they see fit, in the manner they designed therefor, to change it.    As we and those who come after us prove inefficient to do that by taking undue liberties with its language, it will be weakened and the respect for the court itself be lessened.    We would make a serious

mistake by being deluded into thinking otherwise from noisy approval or criticism of the hour, indicating popular desire for the fundamental law to be administered as those *in .præsenti* would like it, instead of as the people who made it intended. There may be, at times, popular unrest with fundamental restraints and wandering away from their safeguards; but in all such cases there.will be return, for only in that can the safety which a constitutional system, in form, guarantees be realized. It may be that I may carry my veneration for the constitution too far, but I do not think so. For that, on the calm judgment of the future I may trust. I freely confess that I believe most of the ills we suffer from are attributable to failure to heed it and that the sure pathway to avoidance of them is that which returns to it. In respect to the particular matter the legislature may easily do so, and doubtless will, to the extent of entering a proposal to amend the constitution in full on the journal of the house of origin at the first session and efficiently refer thereto in the other house. I venture to suggest that is not only the best policy, but the only safe-one, since the result is such that a single incident might change it.

I have endeavored in this opinion to keep within the scope of the concurrence of Justices Timlin and Vinje with my views, but responsibility for the manner of treating the matter is personal. Doubtless one or both of my brethren will write to some extent on the subject.

Timlin, J. (*dissenting in part*). I agree to the affirmance of the judgment appealed from. The unanimous concurrence of all members of this court in such affirmance demonstrates that there is no question of constitutional law involved in this case and that all said concerning such question is *obiter dictum*. Whether the. amendment in question was legally adopted or not, in no way affects the decision of this case. I took part in the first decision made, and since that time I

have had read over to me the briefs of counsel upon rehearing, the opinion of the court by the Chief Justice, and the dissenting opinions of Justices MARSHALL and VINJE. I do not concur in the majority opinion so far as it attempts to interpret the constitution, and perhaps it would be better to end this dissent with that brief statement; or to dispose of the whole matter by striking out from all of the opinions all discussion or attempted decision of points of constitutional law not necessarily involved in the case. But the majority opinion takes high ground respecting our duty to correct to-day the errors of yesterday, and I am thereby encouraged to hope that this court may in the future, with like courage, again correct the errors of today, if convinced of such errors; and in suggesting that the majority opinion was the result of panic I do not wish to be understood as imputing to my associates of the majority lack of moral or physical courage, but only that their consideration of imaginary calamitous consequences destroyed that mental equipoise necessary for correct interpretation. If the discussion of such question is to appear, I think I will add a few *a priori* arguments to show the fallacy lurking in the majority opinion. I am well aware that it is quite possible to

> "Discuss a thing till all men doubt it
> And write about it—and *about* it."

Over-discussion and mind strain often produce inability to go straight to the question, and have a tendency to cause the mind to hover around it or about it.

Questions of interpretation are often of the utmost importance and sometimes profoundly affect the course of history and the interests of millions of people. The great war of the Rebellion involved a question of the interpretation of the federal constitution relative to the right of a state to secede from the Union. The unprecedented war now devastating Europe would not have occurred at present had Germany placed upon the articles of the Dreibund the same interpretation as did Italy. Instances of this kind might be multiplied. Lieber

mentions some in his thought-suggesting work on Hermeneutics. The various creeds which have divided and distressed mankind in the past rested upon diverse interpretations of sacred or authoritative writings. Not only do great cataclysms usually involve questions of interpretation, but like questions are present in the slower encroachments of tyranny or the equally disastrous encroachments which break down the securities of prosperity and property and inaugurate a state of disorder and anarchy.

Casuists find other and more underlying causes, mostly economic, for these disturbances and changes. Certain it is that behind the differences of interpretation lies a self-interest or other motive which suggested that interpretation or confirmed the interpreter in his belief of its accuracy. In this strife we see each of the contending parties justifying his inconsistent position by pointing to the same paragraph in the same instrument. The assured and uncompromising attitude of the disputants in such controversy shows the disastrous effect of bias or other mental disturbance upon true interpretation. No other form of mental activity is more susceptible to disturbances of this kind and upon none is the effect of such disturbance more disastrous. Only the tranquil and impartial mind can interpret correctly. To approach a question of interpretation with any bias in favor of a particular outcome is fatal to correct interpretation.

"Whoever, unable to doubt, and eager to affirm, shall establish principles, proved, conceded and manifest (as he thinks), and according to the unmoved truth of these shall reject or receive others as repugnant or favorable; he shall exchange things for words, reason for insanity, the world for a fable, and shall be incapable of interpreting." Francis Bacon.

So also if we begin with rules of interpretation, treating such rules as authoritative verities, and from this starting point proceed in the work of interpretation, we shall hardly arrive at the truth.

In the first opinion in this case it was said *arguendo* that

the action of the legislature in proposing amendments to the constitution was ministerial. I desire to withdraw from that statement whatever of implied assent of mine there may be. I do not think it is helpful to so classify the nature of the act performed by the legislature in proposing amendments to the constitution or that it is correct to call such act ministerial. The operation consists in considering and understanding the mischief to be remedied, selecting words and sentences appropriate for that purpose, and bringing many different minds into harmony with the notion that there is a mischief, that it ought to be remedied, and that the language employed is adequate for that purpose and is not too broad so as to involve other injurious consequences. This is precisely the process employed in the enactment of any statute. It might be considered that the final act of agreement by the legislature in the latter case completes a rule of action, while in the former further approval of other authority is necessary to give the writing this quality. But this is at best a debatable point, for according to some the process of statute making is not complete until the act has received executive approval, either by silence for the specified time or by express approval. We need not go far back in the history of England to reach a time when statutes were enacted by petition of the Parliament granted by the king. It was thought that the only substantial difference between this mode and that employed at present was that in the former the executive could grant part of, and deny part of, the petition, while in the procedure by bill he must approve or disapprove all. A faint echo of this conflict will be found in sec. 17, art. IV, of our state constitution. Besides this, there is no such logical or scientific classification of official acts. It does not follow that because departments of government upon historical grounds or with reference to their chief function may be so classified, a given act must be either wholly judicial, legislative, executive, or ministerial. I reject this test because in employing it we are reasoning from the nonexistent or un-

known to another unknown.    I begin with the simple truths
that we know.

Sec. 1, art. XII, Const., is as follows:

"Any amendment or amendments to this constitution may
be proposed in either house of the legislature, and if the same
shall be agreed to by a majority of the members elected to
each of the two houses, such proposed amendment or amend-
ments shall be entered on their journals, with the yeas and
nays taken thereon, and referred to the legislature to be chosen
at the next general election, and shall be published for three
months previous to the time of holding such election; and if,
in the legislature so next chosen, such proposed amendment
or amendments shall be agreed to by a majority of all the
members elected to each house, then it shall be the duty of the
legislature to submit such proposed amendment or amend-
ments to the people in such manner and at such time as the
legislature shall prescribe; and if the people shall approve
and ratify such amendment or amendments by a majority of
the electors voting thereon, such amendment or amendments
shall become part of the constitution; provided, that if more
than one amendment be submitted they shall be submitted in
such manner that the people may vote for or against such
amendments separately."

At the biennial session of the legislature in 1905 an amend-
ment to sec. 1 of art. III of the state constitution was pro-
posed in the Assembly.    This was a resolution merely strik-
ing out par. 2, sec. 1, art. III, of the existing constitution, and
it was numbered 16, A., and entitled a joint resolution strik-
ing out the paragraph above numbered, and it was, when in-
troduced and before agreed upon, entered at length on the
Assembly Journal in the form above set forth.    This resolu-
tion was by the Assembly referred to a committee thereof,
and that committee reported a substitute resolution materially
different and reading as follows:

"Resolved by the Assembly, the Senate concurring, that
subsection 2 of Article III of the constitution of the state of
Wisconsin, be amended so as to read as follows:

" '2. Persons of foreign birth who, prior to the first day
of December, 1908, shall have declared their intentions to be-

come citizens conformable to the laws of the United States on the subject of naturalization, provided that the rights hereby granted to such persons shall cease on the first day of December, 1912.' "

This substitute, after being reported by the committee, was agreed to by the requisite majority in the Assembly and then sent over to the Senate and thereafter agreed to by the requisite majority of the Senate. It was never entered upon the journal of either house of the legislature of 1905, either *in extenso* or in substance as agreed to or after having been agreed upon. The most descriptive reference thereto was as follows: "Jt. Res. No. 16, A. Resolution providing for an amendment to section 1 of article III of the constitution." In what manner this amended sec. 1, art. III, could not be known from the journals, nor whether it enlarged the electorate or diminished it, or qualified or disqualified a particular person or a class. The exact nature of the proposed amendment could of course have been ascertained from the files in the office of the secretary of state, assuming the permanence and integrity of such filed manuscript. This amendment was submitted to the legislature of 1907 as "A Jt. Res. No. 47, A. Joint resolution to amend section 1 of article III of the constitution, relating to electors." This last number and title was entered in the journals of the legislature of 1907, and after the resolution was agreed upon the resolution was entered at length in the Assembly Journal for that session with the ayes and noes stated.

When the first decision in this case was approved unanimously by this court and filed, the opinion of the court was written by Justice MARSHALL with a concurring opinion by Chief Justice WINSLOW. I think it is nowhere expressly stated in either of these opinions that the word "entered" found in art. XII of the constitution could be satisfied only by a verbatim record or a record *in extenso* of the proposed amendment, although that conclusion is inferable from the

language used.   This different proposition is, however, stated positively and decided both in the opinion of the court and in the concurring opinion, viz. that a mere reference on the journal to the proposed amendment by number and title, in a case where the title itself did not disclose the substance of the amendment, would be insufficient.   If any constitutional question was then involved that was all that was necessary to the decision and consequently all that could have been conclusively decided.   The rest was in any view *obiter dictum.*   For there was there presented a case where the substitute resolution constituting a proposed amendment to the constitution, after having been agreed upon or as agreed upon, was not entered in either journal at the first session otherwise than by reference to the number and title of the resolution proposing the amendment in question, and this title did not disclose the nature of the amendment.

The question of the effect of construction by co-ordinate constitutional departments of government was not considered. The somewhat cognate question of acquiescence, long persisted in, was not seriously argued or fully considered, although the opinion by Justice MARSHALL does contain a statement showing that this last question is not concluded by the decision but reserved for future adjudication when it arises. It was not thought then, and I understand it is not now thought, that there is in the attempted amendment of sec. 1, art. III, any question of long acquiescence or of such alteration in the framework of government, or in the financial affairs of the state, or in the property or personal rights of citizens, as might preclude full and fair inquiry concerning the interpretation of the constitution as written.

The first impression made upon the reader by art. XII is that which it made upon this court in the original opinion by Justice MARSHALL, approved by the whole court.   In interpretation the first impression made by a writing is an important factor, because the writing is then being tested in the

same manner that the writer expected and in the same manner that the writer prepared the writing to be received. Proceeding a little farther, we perceive that an amendment to be effective must have been agreed upon by each of the two houses constituting the first legislature, by each of the houses constituting the second legislature, and later on by the people at an election. Failure to obtain the consent of the designated body in either of the three instances would be fatal to the amendment. This I consider self-evident, but if authority is necessary the forestry case (*State ex rel. Owen v. Donald, ante,* p. 21, 151 N. W. 331) is here in point. A considerable interval of time must elapse between the first approval by the first legislature and the second approval by the second legislature, and also between the latter and the approval by the electorate. When properly adopted the amendment displaces the existing fundamental law, which is always a serious thing, and for the future overrides and controls the power of the legislature, the executive, and the judiciary, which is also a serious matter. It is self-evident that the remainder of the constitution and all future statutes must be measured against the amendment, and thus the exact words of the amendment become of the greatest importance in such case, so that the amendment must be approved by each of the three several tribunals in the same words or it cannot be said to have received the approval of two legislatures and of the electorate. There was therefore a reason for preserving an authentic and unimpeachable record.

I consider it obvious that the writers of the constitution were afflicted with no inability to express their ideas. The instrument itself shows this, and it was written by a capable body of men at a time when constitution making was quite common in this country and was much discussed. Within thirty years prior to the writing of our constitution in 1847, the states of Ohio, Indiana, Illinois, and Michigan had been carved out of the great Northwest Territory and had each

adopted a constitution. If my memory is not at fault, some of the older states had within this time adopted new constitutions. The section of our constitution in question relating to amendments was exactly like the corresponding section in the Michigan constitution. There was nothing to incline the constitution makers to intentional ambiguity, but rather the contrary. Neither are we now attempting to apply the section in question to something unforeseen by the writers, or something not in contemplation of the writers. The writers of the constitution were as familiar with parliamentary procedure and with the other parts of that same constitution as were the seven judges of this court on January 12, 1915, when, unshaken by panic, they recorded their first and unbiased impressions of the correct interpretation of this section. The writers of the constitution knew and we knew that every act, bill, or resolution makes its first appearance in the form of a manuscript, which is put upon file and given a number and title, and they knew and we knew that a resolution is only agreed upon after the introduction of this preliminary manuscript, and after it has received its number and title, and after it has been referred to a committee by such number and title at least once, and after such committee has reported upon it by number and title, and after the legislative body has agreed in that report or in some substitute for that report. The title might contain a statement covering substantially all there is in the resolution, or it might be as irrelevant to the contents of the latter as the name of an English inn. When two or more different amendments are proposed to the same section of the same article of the constitution, the title without the number would not identify at all. They knew and we knew that the constitution required each house of the legislature to keep a journal of its proceedings (sec. 10, art. IV). Also to have a chief clerk (sec. 6, art. XIII); also to enact no law except by bill, which means a filed statement in writing (sec. 17, art. IV). It was known that the secretary of

state was required to also keep a record of the official acts of the legislature (sec. 2, art. VI). By expressly providing for another record in the case of proposed amendments, it was intended and understood the record of the secretary of state was not sufficient. It was also known that bills are referred to by number and title and that the title does not always express the subject or all subjects covered by the bill (sec. 18, art. IV).

Notwithstanding these provisions we are presented with the additional requirement found in art. XII, sec. 1, to the effect that if any amendment or amendments to this constitution shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on (not in) their journals, with the yeas and nays taken thereon. It seems to me plain that the amendment is required to be entered only if the same shall be agreed to by a majority of the members elected. Therefore it is not to be entered until so agreed to. It could not be so agreed to until long after it received its number and title and was introduced and referred and amended and reported upon and whatever else might be necessary to reach an agreement. Hence, the requirement that it be entered could not be satisfied by the number and title of the resolution, because this requirement that it be entered relates to a resolution which already had a number and title and which in the nature of things could not in the earlier stages of its existence be referred to or identified except by either a number or title or both, or by reading it at length every time it was mentioned. So we may see at this distance along the path of interpretation, not necessarily what the word "entered" means, but that it does not mean referred to in the journal by number and title, but something more than that. The filed manuscript with its number and title was manifestly not considered a sufficiently certain and permanent record of the proposed amendment. Such manuscripts are liable to be lost or sub-

stituted, or altered between terms of the legislature, and have not the permanency of the written journal record required by law to be kept. Such was evidently the intention of the writers of the constitution. This is quite as plain in this respect as any registry statute which provides that a book of record be kept and requires that the filed instrument, bill of sale, judgment, mortgage, registry, etc., be entered therein. I think, where the purpose of the requirement is to preserve a record of the contents of the filed instrument, no such statute could be satisfied by merely noting the number and title of the filed instrument in the record in cases where the title did not disclose the contents of the instrument or the substance of such contents. Indeed, this is a much stronger case for recording *in extenso* because of the necessity of subsequently approving it in the same terms, and because of the words "if agreed upon." These words not only import a duty arising long after the instrument has received a title and number, but furthermore apply to an instrument subject to change and expected to be changed in the process of arriving at agreement and after title and number are bestowed upon it.

I thus arrive at a conclusion in accord with *the decided point* in the first decision in this cause and also in harmony with a decided point in the majority opinion upon rehearing. That is to say, that the constitution *as written* did require the proposed amendment to be entered on their journals, otherwise and more explicitly than by a mere reference to number and title. For all this consideration of the legislative procedure with reference to other amendments is immaterial if the constitution as written was satisfied by a mere reference to number and title.

Arriving at this point, we find that collateral inquiries and relevant doubts diminish, and the question under investigation narrows itself, and if the premises are correct the question of interpretation remaining can only be: Would the constitution as written require the amendatory resolution as

agreed upon to be entered in substance or *in extenso* on "their journals?" No other inquiry is here possible. I invite criticism of this last statement.

Now, between entering a resolution *in extenso* on a book and entering it in substance there is only a difference in degree. Under any fair interpretation of a requirement that a resolution be entered on a book in substance, that command would be complied with by entering it *in extenso*. A requirement that a resolution be entered *in extenso* would also be complied with in most cases by entering it in substance, because this would be the legal equivalent of an entry *in extenso* when all of the material or substantial portions of the resolution were entered. Cases might be imagined where such requirement could only be complied with by following the statutes or resolution verbatim, or nearly so. For illustration, if a title or an immunity or a burden were created, provided, or upon condition, that an instrument or resolution be recorded *in extenso,* there would be a reason for distinguishing between an entry in substance and an entry *in extenso;* but that is not the case here. If we grant that the entry in substance contains all the material portions of the instrument, it would follow that a requirement that it should be entered *in extenso* is satisfied, because the law would consider substance instead of mere words.

The difference between entering a resolution *in extenso* and entering it in substance is merely one of words, because entering a resolution of this kind in substance means so entering it that no material word is omitted from the entry, and no one can read the entry in substance without being informed of all the substantial portions of the resolution itself. And an entry of this kind would answer all the purposes of art. XII.

Few constitutional provisions can be considered directory in the same sense that certain statutes are said to be directory, but it is not impossible to frame directory constitutional pro-

visions.    So sentences may be constructed and words used in such collocation that the omission of one or more of such words will not alter the meaning.    There may also be found in state constitutions declaratory provisions which have no effect, as that the state could enact no law impairing the obligation of contracts.    This adds nothing to the federal provision on that subject, and is of the same nature as a declaration that, until changed by authority, the common law shall be in force in the state.    Other provisions are merely declarative or hortatory, like sec. 22 of art. I, and we are all familiar with the constitutional provisions which have been called "mere glittering generalities."

It would ordinarily be quite difficult to enter an amendatory resolution in substance "on their journals" without entering it *in extenso,* but that has no bearing upon the question we are considering.    If we investigate the instances in which an entry in substance did not comply with the requirement that the instrument be entered *in extenso,* we will find that they are cases in which the instrument was not entered in substance but some of the substance was omitted from the entry. Granting that the instrument is entered in substance we have the legal equivalent of an entry *in extenso.*    So that we may say that a requirement that an instrument be entered in substance is satisfied by an entry *in extenso,* and, conversely, a requirement that an instrument be entered *in extenso* is satisfied by an entry of all of the material or substantial provisions thereof.

1. The reason for the requirement in question argues in favor of an entry *in extenso* in both journals, and unqualified by other considerations would settle this question of construction.

2. The fact that art. XII uses the language "entered on their journals," while sec. 10, art. V, of the same constitution, relating to veto messages, requires that the objections there mentioned be "entered at large upon the journal," is

an argument in favor of the view that the requirements of art. XII would be complied with by an entry in substance.

3. The long continued practice of the legislature of entering the amendatory resolution *in extenso* in the journal of the house of origin with a number and title, and in the journal of the other house only by such number and title, indicates an understanding that a substantial compliance was sufficient.

4. The last two, taken with the consideration that for purposes of certainty the entry in substance, properly understood, is the equivalent of the entry *in extenso,* are, I think, sufficient to turn the scale in favor of the latter interpretation.

5. An entry *in extenso,* with an identifying number and title connected with such entry in one journal, together with an entry by reference to this same number and title in the journal of the other house, is an entry in substance. *Id certum est quod certum reddi potest.*

Right here I might note a curious discrepancy between the views of counsel who challenged the correctness of the first decision herein and those of this court in the majority opinion on rehearing. Mr. Lines argued that the words "entered in their journals" required no record *in extenso* on the journal, but were satisfied by an entry indicating the substance of the amendatory resolution, basing this argument in part upon the more specific requirement relating to veto messages contained in the same constitution and found in sec. 10, art. V. The last mentioned section requires the legislative house receiving the veto message to "enter the objections at large upon the journal." Hence he argues that art. XII, merely using the word "entered," did not require an entry at large.

Mr. Lines's argument may be thrown into syllogistic form as follows:

First. Art. XII does require an entry upon "their journals," but not an entry at large.

Second. It is therefore complied with by an entry in substance.

Third. A reference in the journal to the number and title

of the amendatory resolution on file constitutes an entry in substance.

The counsel gives a semblance of logic to his argument, the fallacy of which will be pointed out later.

Now, the majority opinion upon rehearing discards the major premise and finds that the constitution as written requires the amendatory resolution to be entered *in extenso* in the journal of each house. The majority opinion thereby destroyed the semblance of logic found in the argument of Mr. Lines, and brought the court in direct conflict with the rule of constitutional law announced in *Lawrence University v. Outagamie Co.* 150 Wis. 244 (136 N. W. 619), and authorities cited on pages 252, 253. For if the true reading of the constitution as written was that the amendatory resolution must be recorded *in extenso* in the journal of each house, and if, as I think I have shown, the reference to number and title was not considered sufficient, then the legislature could not by long continued practice place a meaning upon art. XII contradictory of and in violation of the command of the constitution. Assuming the correctness of the major premise of counsel's argument his conclusion fails, first, because if a substantial entry only is required, the legislature by long continued practice established, not that a mere reference to title and number constitutes a substantial entry, but that an entry *in extenso* of the amendatory resolution, with a given number and title, in the journal of the house of its origin, together with an identifying reference to the same number and title in the journal of the other house of the legislature, constituted a substantial entry in each journal,—in the one by entering *in extenso,* accompanied by a given number and title, and in the other by an entry giving the same number and title. This was what was done except in one case and except in cases where there was an entry *in extenso* on both journals, and this was the practice, and it negatives rather than supports the proposition that a mere reference to the amendatory resolution by number and title is sufficient.

I understand that twenty-four amendments to the constitution only were adopted prior to the amendment in question or since the birth of this state. Six were entered *in extenso* on both journals and eighteen on the journal of the house of origin *in extenso*, so we may say that twenty-three of them were entered as above stated. That is to say, the resolution *in extenso*, or its substance, in the house of origin, with a given number and title, and in the other house either *in extenso* or by reference to this same number and title. This preserves the certainty required quite as well as if it had been recorded in both journals, except in the case of destruction of one of the journals. It also, in the journal in which the amendatory resolution was not entered *in extenso*, conformed to the common-law rule regarding *"Id certum est quod certum reddi potest."* Why the majority opinion rejected the major premise of counsel is apparent. If they conceded that the constitution as originally written would be complied with if the amendatory resolution was entered in substance "on their journals," then they would have to admit that by long legislative practice an entry in substance was understood to mean an entry *in extenso* in the journal of the house of origin, with an identifying number and title, and an entry on the journal of the other house by such number and title. This would have saved all the constitutional amendments except the one in question here, and would have removed all cause for panic, if not all panic.

There is in the majority opinion, by reference to the constitutional amendment increasing the number of justices in the supreme court, a suggestion of *"sauve qui peut,"* but I am loath to believe that this alone was sufficient to account for the aberration of the majority. In the last mentioned case the title gave the whole substance of the amendatory resolution, and therefore such resolution was entered in substance. The counsel mentioned began his argument right, but I think erred, first, in ignoring the fact that art. XII, in effect, forbade the entry on the journal of the amendatory resolution

merely by number and title; second, in failing to conclude from his premises that the long established practice which would tend to determine what was a substantial entry must be ascertained from what the legislature did, and not by rejecting all that they did in favor of an item that they omitted to do. It is well that a majority of a court of last resort, while they may conclusively determine the cause, cannot conclusively determine what is logical or what is not logical.

The majority opinion is in my estimation subject to this weakness: After having determined that, as written, the constitution requires the amendatory resolution to be entered *in extenso* on the journal of each house, it holds that a failure to enter such resolution *in extenso* on the journal of one house, although entered *in extenso* on the journal of the house of origin, and referred to, as I have said, in the journal of the other house, was to disregard in part, and as to that one house, the constitutional requirements. This having been persisted in for a long time, I think in eighteen of the twenty-four amendments, the legislature may now and from henceforth abandon its practice of partially complying with the constitution as written, and need not comply with it at all.

It seems to me very plain that this is putting upon the constitution a construction which the majority opinion concedes that the constitution as written will not bear, and which the legislature never put upon it, except in adopting the amendment in question in this cause, and which is contrary to the construction which the legislature did put upon this art. XII of the constitution; because recording the resolution *in extenso* in one journal and referring to the number and title in another would never sanction a practice of recording it in neither journal, unless we are prepared to say that a partial disregard of constitutional provisions long persisted in by a department of government authorizes a further and total disregard of such provisions. With all respect to the majority opinion, this reads to me like a *reductio ad absurdum*.